File Name: 06a0385n.06

Filed: June 1, 2006

NOT RECOMMENDED FOR FULL-TEXT PUBLICATION

Case No. 04-3904

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| JANELL RUTHERFORD et al., | ) | |
| | ) | |
| Plaintiffs-Appellants, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR THE |
| | ) | NORTHERN DISTRICT OF OHIO |
| CITY OF CLEVELAND et al., | ) | |
| | ) | **OPINION** |
| Defendants-Appellees. | ) | |

---

**BEFORE: MOORE, ROGERS, and McKEAGUE, Circuit Judges.**

**McKEAGUE, Circuit Judge**. Appellants, non-minority applicants for the position of police

patrol officer in Cleveland, Ohio (the "City"), filed claims of reverse discrimination and disparate

treatment against the City, the Cleveland Police Department ("CPD"), and several other City

defendants (collectively, the "City defendants"). Appellants' claims relate to two earlier lawsuits

involving the City's past discrimination against African-Americans and Hispanics (collectively,

"minorities") in hiring and promoting by the CPD. The district court approved in those cases a

consent decree that implemented a race-based plan to advance the hiring and promotion of minority

police patrol officers.

In the proceedings below, the City defendants were granted summary judgment. Appellants

sought review, asking this court to reverse. As explained below, we affirm the district court's

judgment. On Appellants' reverse discrimination claim, the City's history of racial discrimination

against minorities – as evidenced by its own admission of discrimination, judicial findings, and

statistical disparities – provided the City defendants with a compelling interest in implementing the CPD's temporary race-based hiring plan. Given several important features of the plan, especially its sunset provision and flexibility, we also find that the plan was narrowly tailored, and thus survives the strict judicial scrutiny required by the Supreme Court's equal protection jurisprudence. On Appellants' disparate treatment claim, we affirm the district court's finding that the claims are without sufficient support in the record.

## I. BACKGROUND

### A.    The *Shield Club* Lawsuits and Resulting Consent Decree

Although the Appellants do not, strictly speaking, contest the constitutionality of the consent decree except as it applied to them in 1993-1994, their claims necessarily take aim at several of its foundations. Thus, we must review the historical record supporting the consent degree. Appellants take issue only with the hiring practices of the CPD, and not its promoting practices; accordingly, only the evidence involving the CPD's hiring history will be reviewed, unless otherwise noted.

In 1966, minorities constituted 6.2% of the CPD police force. In 1972, that figure had risen to 8.1%. In comparison, minorities made up approximately 40% of the City's population according to 1970 census figures. The Shield Club, an organization comprised of minority police officers who represented the interests of minority officers and applicants, filed a lawsuit against the City, the CPD, and other defendants alleging racial discrimination in the hiring and promoting of minority police patrol officers.[1]

As one of their claims, the *Shield Club*-plaintiffs maintained that the CPD's entrance

---

[1]The *Shield Club*-plaintiffs filed a subsequent lawsuit against City defendants. The two cases – Nos. C72-1088 and C77-346 – were consolidated.

examination discriminated against minorities. The district court agreed, finding that the high failure rate of minorities compared to the much lower failure rate of non-minorities supported plaintiffs' *prima facie* case of discrimination. *Shield Club v. City of Cleveland*, 370 F. Supp. 251, 253 (N.D. Ohio 1972). The district court also found that the examinations were not validated for job performance. *Id.* Faced with this evidence and no effective rebuttal by the defendants, the district court concluded that the examinations had a racially discriminatory impact. *Id.* at 254. The district court's conclusion was buttressed by the historical workforce disparities between minorities and non-minorities. *See id.* at 255.

As a result, the district court directed the CPD to appoint minorities at a rate no less than 18% of its incoming police patrol officers. *Id*. The 18% rate was equal to the percentage of examination passers who were minorities. *Id.* In response to the deficiencies in the examination, the district court directed the defendants to create an examination that was job-related. *Id.* at 256.

Two years later, the district court found that the CPD's screening procedures used to determine which applicants, of those who passed the entrance examination, could be appointed as officers had a racially disparate impact on minorities. *Shield Club v. City of Cleveland*, No. C 72-1088, 1974 WL 223, at *2 (N.D. Ohio July 6, 1974). The court ordered defendants to develop and implement racially-neutral screening procedures. *Id.* at *3. Faced, however, with a serious shortfall of officers and without racially-neutral selection procedures available, the district court also directed the City to hire a specific percentage of minorities as officers. In determining the target, the district court noted that of the 400 highest ranking applicants based on the 1974 examination, approximately 39.5% were minorities. The court therefore instructed the City that if a significant departure in officer hiring (more than 2% to 3% below 39%) developed, it would take another look at whether the City was engaging in racial discrimination. *Id.* at *3.

3

In 1976, the district court determined that the Chief of Police had a racially discriminatory purpose in perpetuating under-representation of minorities in certain minority-dominated districts of the City. *Shield Club v. City of Cleveland*, No. C72-1088, 1976 WL 736, at \*12 (N.D. Ohio Oct. 20, 1976). The court specifically found a "continuing marked under-representation" of minorities in these districts, without any explanation or justification by the defendants. *Id.*

Subsequently in 1977, the parties submitted a consent decree to the district court. The parties entered into the decree to "effectuate an effective prospective remedy designed to eliminate all vestiges of race discrimination within the City of Cleveland Police Department." Consent Decree ¶ 1, JA at 586. As to minority officer hiring, the parties stipulated that the CPD would utilize "only such selection criteria . . . as are non-discriminatory and demonstrably job-related." *Id.* ¶ 9, JA at 588. They established a minority-hiring target of not less than 35.8%, a figure "based upon external labor market figures contained in the 1970 census." *Id.* ¶ 12(a), JA at 589. In order to accomplish this target, the CPD agreed temporarily to hire no less than three minorities for every four non-minority hires (the "3:4 hiring ratio"). *Id.* ¶ 12(c), JA at 589.

According to its charter, the City did not employ a pure "examination rank order" system for hiring officers. Rather, it used what is called the "one-in-three" rule (the "1:3 rule"), which gave the CPD discretion in selecting one candidate from a group of three qualified candidates. Those candidates not appointed on the first review remained on the list in their rank order and were considered again, along with the next highest-ranking candidate, for the next available opening. If a candidate had been certified and not chosen on four separate occasions, that person was removed from the eligibility list. The consent decree permitted the CPD to continue to use the 1:3 rule, *id.* ¶ 10, JA at 588; however, to ensure race played a minimal role in hiring, but also that the 3:4 hiring ratio was met, the CPD could maintain separate lists of qualified minority and non-minority

4

candidates, *id.* ¶ 12(c)(5), JA at 590. Qualified minorities were compared against each other, qualified non-minorities were compared against each other, but minorities were not compared against non-minorities.

The district court held a hearing to determine whether to approve the consent decree. The court specifically addressed whether the *Shield Club*-plaintiffs had proven their claim of a historic pattern of racial discrimination. While the court had earlier determined that the record had not convinced it that the *Shield Club*-plaintiffs had carried their burden, it noted during the approval hearing that this finding was "not engraved in stone." JA at 959. The district court specifically focused on Paragraph 3 of the consent decree. In that paragraph, the parties agreed that the "entire record" reflected a "history of race discrimination in the hiring practices and in the promotion practices" of the CPD. *Id.* In light of this admission by the defendants, the district court found it unnecessary to hold additional proceedings "to go all through what evidence was spread on this record for five years." JA at 960. The district court concluded that the record was sufficient to reach "an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated," accepting as fact the defendants' admission of racial discrimination. *Id.* at 961 (quoting *Flinn v. FMC Corp.*, 528 F.2d 1169, 1173 (4th Cir. 1975)). The district court placed its imprimatur on the consent decree in November 1977. At the time, minorities made up 9.2% of the City's police officers.[2]

---

[2]Subsequent to the entry of the consent decree in the *Shield Club* cases, the City admitted to a pattern of racial discrimination in its fire department. The Vanguards of Cleveland, an organization of African-American and Hispanic firefighters, brought similar claims against the City as those presented in the *Shield Club* cases. The City likewise entered into a consent decree in that case, which was contested and upheld. *See Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501 (1986); *Vanguards of Cleveland v. City of Cleveland*, 23 F.3d 1013 (6th Cir. 1994). As the Supreme Court characterized the City's position, the City decided to negotiate with the Vanguards rather than engage in "another round of futile litigation." *Int'l Ass'n of Firefighters*, 478 U.S. at 506.

Near the end of 1984, the *Shield Club*-plaintiffs sought to modify and extend the consent decree. By this time, minorities made up 20.8% of the CPD police force. The defendants initially opposed such modification and extension. The district court determined that the defendants had met their obligations as to promotions, but that there remained a question of fact on whether the decree should be modified and extended as to officer hiring. The parties then submitted an Amended Consent Decree (the "ACD") dealing solely with CPD hiring practices. Upon review of the decree, the district court approved it.

The ACD expressed the parties' intent to "finally and fully resolve these actions so as to preclude any further requests for extension and/or modification." ACD Preamble, JA at 856. The decree again provided that the defendants would use "only such selection criteria . . . as are non-discriminatory and demonstrably job related" and that the CPD would continue to use the 1:3 rule. *Id.* ¶¶ 2-3, JA at 857.

> Specifically as to minority hiring, the ACD required the following:
>
> Temporarily and until such time as 33% of the police officers employed by the City are minorities or until December 31, 1992 (eight years), whichever time or event occurs first, defendants shall hire no less than three minority police patrol officers for every four non-minority police patrol officers, . . . .

*Id.* ¶ 4(a), JA at 858. In the event the CPD failed to hire a minimum of 70 patrol officers in any year during the eight-year period, the 3:4 hiring ratio would continue "in full force and effect for one additional year for each year in which the City shall fail to hire the minimum number of police patrol officers, unless the City has otherwise achieved the 33% level." *Id.* ¶ 4(b), JA at 859. The decree permitted the CPD to use separate eligibility lists for non-minority and minority candidates in conjunction with the 1:3 rule. *Id.* ¶ 4(a)(5), JA at 859.

Throughout the eight-year period, the CPD never reached the target of a 33% minority police

6

force. Moreover, the CPD failed to hire at least 70 police patrol officers in 1986 and 1991. Accordingly, the CPD was bound under the ACD to continue using the 3:4 hiring ratio until the earlier of December 31, 1994, or the date when minorities made up 33% of the police force. The CPD indeed met the 33% target in mid-1994, so the district court concluded that the defendants had fully complied with the requirements of the decree on that date and that the decree expired under its own terms.

B.      **Appellants' Present Lawsuit**

Appellants filed their lawsuit in May 1994, shortly before the ACD expired. Appellants are non-minority applicants for the position of police patrol officer with the CPD. A portion of them comprise a sub-class of applicants who allege that as a result of the ACD's extension into 1993 and part of 1994, they were never considered for the position even though minority candidates who ranked lower than they did on the eligibility list were considered. The remaining Appellants are individuals who were considered for the position in 1993 and 1994, but were rejected by the CPD based on qualifications that were allegedly not applied to minority applicants who were lower on the eligibility list, but still hired.

Appellants argue that the application of the City's race-based hiring plan, as it was applied in 1993 and 1994, was unconstitutional. Specifically, Appellants claim that the ACD should not have been applied beyond 1992, and that such application resulted in less qualified minority applicants being hired as police patrol officers. They argue that had the parties and district court in the *Shield Club* cases attempted to develop the type of findings required under the constitution, the district court would have found that application of the plan in 1993-1994 was not justified by a compelling governmental interest, nor was it narrowly tailored to achieve such an interest.

7

Furthermore, Appellants contend that they received less-favorable treatment than minorities during the candidate review and selection process.

In their amended complaint, Appellants set forth five separate causes of action: (1) racial discrimination in the CPD's selection of police patrol officers in violation of the Civil Rights Act of 1871, 42 U.S.C. §§ 1981 and 1983, and the Equal Protection Clause of the Fourteenth Amendment; (2) loss of property interest in consideration for hire based on examination rank in violation of the Civil Rights Act of 1871, 42 U.S.C. § 1983, and the Due Process Clause of the Fourteenth Amendment; (3) civil conspiracy in violation of the Civil Rights Act of 1871, 42 U.S.C. § 1985(3), and the Equal Protection and Due Process Clauses of the Fourteenth Amendment; (4) violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e; and (5) violation of Ohio's common law of fraud. On the City defendants' motion, the district court granted them summary judgment, finding that Appellants did not have standing to contest the consent decree or its application. We reversed and remanded to the district court for further proceedings. *Rutherford v. City of Cleveland*, 137 F.3d 905, 911 (6th Cir. 1998).

After engaging in discovery, the parties filed motions for summary judgment. The district court granted summary judgment to the City defendants in two separate decisions. Appellants now seek appellate review on their equal protection and Title VII claims, as well as their disparate treatment claims.[3]

## II. ANALYSIS

### A. Summary Judgment Under Fed. R. Civ. P. 56(c)

---

[3]Appellants conceded below that summary judgment was appropriate on their common-law fraud and civil conspiracy claims. Appellants have not pursued on appeal their loss of property claims related to the CPD police patrol officer positions they were not offered. Accordingly, these claims are not before us on appeal.

We review the factual findings of the district court for clear error, *see Brunet v. City of Columbus*, 1 F.3d 390, 410 (6th Cir. 1993), and its legal conclusions, including whether summary judgment is appropriate, *de novo*, *see Zambetti v. Cuyahoga Cmty. College*, 314 F.3d 249, 255 (6th Cir. 2002) (citation omitted). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Under Rule 56(c), a fact is material only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Whether a factual issue is genuine requires consideration of the applicable evidentiary standards. *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 451 (6th Cir. 2004).

As the moving parties, the City defendants bear the initial burden of showing that there exists no genuine issue of material fact to litigate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court reviews the evidence and draws all reasonable inferences in favor of Appellants as the non-moving parties. *Zambetti*, 314 F.3d at 255 (citation omitted). Appellants must show, however, more than a "mere . . . scintilla of evidence" to defeat summary judgment; "there must be evidence on which the jury could reasonably find" in their favor. *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (citation omitted). Moreover, if the City defendants carry their burden of proof, the burden then shifts to Appellants to "produce evidence that results in a conflict of material fact" to be resolved by the fact-finder. *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

**B.      Race-Based Classifications Must Survive Strict Judicial Scrutiny**

Appellants state that they do not question the constitutionality of the City's race-based hiring plan – embodied in the original consent decree and the ACD – as it was applied prior to 1993. They

9

insist instead that their claims arise from application of the ACD in 1993-1994. Yet, if the City's affirmative action plan was unconstitutional as originally implemented and amended, it is hard to fathom how it could be constitutional in 1993-1994. Conversely, if the plan was constitutional in 1977 and 1984, this would be some support for finding it constitutional as it applied in 1993-1994 (given its automatic sunset provision). Moreover, Appellants repeatedly attack the reasoning and factual record which underpin the original consent decree and the ACD. Thus, while focusing on the ACD as it applied in 1993-1994, we also address issues touching squarely on the basic constitutionality of the original consent decree and ACD.

We review the CPD's hiring decisions, based in part on race, under the Equal Protection Clause of the Fourteenth Amendment.[4] *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 273 (1986). "The Equal Protection Clause prohibits discrimination by government which either burdens a fundamental right, targets a suspect class, or intentionally treats one differently than others similarly situated without any rational basis for the difference." *Trihealth, Inc. v. Bd. of Comm'rs*, 430 F.3d 783, 788 (6th Cir. 2005). Here, the fundamental right of Appellants "to be treated with equal dignity and respect" by a public employer without reference to their race was implicated by the City's temporary race-based hiring plan. *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989).

Given this fundamental right of equal protection, it is now beyond question that all racial preferences instituted by a government actor – even those actions sanctioned, like here, under a consent decree – must pass strict judicial scrutiny. *Grutter v. Bollinger*, 539 U.S. 306, 326 (2003); *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 227 (1995); *Croson*, 488 U.S. at 493-94; *United Black Firefighters Ass'n v. City of Akron*, 976 F.2d 999, 1008 (6th Cir. 1992). The race of the

_____

[4]The Equal Protection Clause guarantees that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

challengers to a government's preference system has no bearing on our analysis: "any person, of whatever race, has the right to demand that any governmental actor subject to the Constitution justify any racial classification subjecting that person to unequal treatment under the strictest judicial scrutiny." *Adarand*, 515 U.S. at 224; *see also Wygant*, 476 U.S. at 273 ("[T]he level of scrutiny does not change merely because the challenged classification operates against a group that historically has not been subject to governmental discrimination.") (citations omitted).

To satisfy strict scrutiny, a race-based remedial plan must be narrowly tailored to accomplish a compelling governmental purpose or interest. *United States v. Paradise*, 480 U.S. 149, 167 (1987). Although a high standard to meet, "[s]trict scrutiny is not 'strict in theory, but fatal in fact.'" *Grutter*, 539 U.S. at 326 (quoting *Adarand*, 515 U.S. at 237). "When race-based action is necessary to further a compelling governmental interest, such action does not violate the constitutional guarantee of equal protection so long as the narrow-tailoring requirement is also satisfied." *Id.* at 327.

## C.    Burdens of Proof

Where a race-based remedy is subject to strict judicial scrutiny, as here, the party defending the remedy bears the initial burden of demonstrating "a strong basis in evidence" that a compelling governmental interest exists which justifies the remedy. *Associated Gen. Contractors of Ohio v. Drabik*, 214 F.3d 730, 735 (6th Cir. 2000) (citing *Croson*, 488 U.S. at 486-92, 500). This burden has also been referred to as the "convincing evidence" standard. *Wygand*, 476 U.S. at 277; *United Black Firefighters*, 976 F.2d at 1009-10. If the defending party meets its initial burden, then the burden shifts to the party challenging the remedy to prove its unconstitutionality. *Aiken v. City of Memphis*, 37 F.3d 1155, 1162 (6th Cir. 1994); *Brunet,* 1 F.3d at 404-05; *see also Wygant*, 476 U.S.

11

at 277-78.[5]

### D.    Compelling Governmental Interest

As we have previously observed, "[t]here is no question that remedying the effects of past discrimination constitutes a compelling governmental interest." *Associated Gen. Contractors*, 214 F.3d at 735 (citing *Croson*, 488 U.S. at 503; *United Black Firefighters*, 976 F.2d at 1010-11). Societal discrimination alone is insufficient, though – the City defendants must make "some showing of prior discrimination" on their part to justify the "limited use of racial classifications in order to remedy such discrimination." *Wygant*, 476 U.S. at 274; *see also Croson*, 488 U.S. at 504 (recognizing a compelling interest in a government's effort to remedy past discrimination for which it was responsible).  Thus, if the City defendants come forward with a strong basis in evidence of past discrimination in the hiring policies or practices of the CPD, they will have met their initial burden.

---

[5]There is some dispute on whether the government should instead bear the ultimate burden to prove the constitutionality of its affirmative action plan in all cases. *See, e.g.*, *Concrete Workers of Colo., Inc. v. City & County of Denver, Colo.*, 540 U.S. 1027 (2003) (Scalia, J., dissenting from denial of writ of *certiorari*) (stating that government should bear ultimate burden of proving constitutionality of race-based affirmative action plan); *Bass v. Bd. of County Comm'rs*, 256 F.3d 1095, 1116 (11th Cir. 2001) (stating that "Supreme Court precedent governing equal protection claims places the burden on a defendant to prove that an affirmative action plan satisfies strict scrutiny"); *Middleton v. City of Flint*, 92 F.3d 396, 404 (6th Cir. 1996) (stating that city had to "prove" it had a compelling interest and that the remedy was narrowly tailored). The Supreme Court's recent decision in *Gratz v. Bollinger* appears to lend support to this position, at least in the education context. 539 U.S. 244, 270 (2003) ("To withstand our strict scrutiny analysis, respondents must demonstrate that the University's use of race in its current admissions program employs 'narrowly tailored measures that further compelling governmental interests.'") (quoting *Adarand*, 515 U.S. at 227). Even if the ultimate burden of proof were to be placed on the City defendants, we find that they have provided sufficient evidence to meet this burden.  Thus, we leave to another day the question of whether parties challenging a remedial race-based plan bear the ultimate burden of proof (as do most parties challenging government action) or rather that burden should be placed on the government-defendants given the important equal protection issues involved.

12

Establishing a strong basis in evidence is not an easy burden to meet. "The only cases found to present the necessary 'compelling interest' sufficient to 'justif[y] a narrowly tailored race-based remedy' are those that expose . . . 'pervasive, systematic, and obstinate discriminatory conduct.'" *Associated Gen. Contractors*, 214 F.3d at 737 (quoting *Adarand*, 515 U.S. at 237). "[A]n amorphous claim that there has been past discrimination in a particular industry" is not enough. *Vogel v. City of Cincinnati*, 959 F.2d 594, 599 (6th Cir. 1992) (quoting *Croson*, 488 U.S. at 499).

To begin, the City's own admission of its history of discriminating against minorities in CPD hiring – a position it fought against in litigation for a number of years – is persuasive evidence of "pervasive, systematic, and obstinate discriminatory conduct." This is not a case in which a government body makes a finding that societal discrimination affects a particular industry, such as in *Croson* and *Adarand*. Nor is this a case in which a government body expressly maintains that it did not engage in unlawful racial discrimination. *See, e.g.*, *Aiken*, 37 F.3d at 1158. This is a case, rather, in which a governmental defendant admits its own culpability – against its own interests at the time – in past racial discrimination. These are critical distinctions. *See Vogel*, 959 F.2d at 600 (recognizing distinction between affirmative action plans based on generalized discrimination in an industry versus discrimination by a city in hiring its own police force).

The City's admission was not simply made in a newspaper article, press release, or in some other voluntary, public forum, but in a consent decree approved by and entered as a judgment of the district court. A race-based hiring plan embodied in a consent decree "stands somewhere in between a voluntary affirmative action program (as in *Wygant*) and a remedial plan that a court has imposed after making a formal finding of intentional discrimination (as in *United States v. Paradise* . . . ), for a consent decree is a hybrid that has 'attributes both of contracts and of judicial decrees.'" *Donaghy v. City of Omaha*, 933 F.2d 1448, 1459 (8th Cir. 1991) (quoting *Int'l Ass'n of Firefighters*, 478 U.S.

13

at 519). On the one hand, as a form of "contract founded on the agreement of the parties, . . . [i]t should be construed to preserve the position for which the parties bargained." *Vogel*, 959 F.2d at 598 (citations omitted). On the other hand, as a form of judgment, "[w]hile the entry of an affirmative action consent decree does not guarantee that the decree serves a remedial purpose . . . , the heightened judicial oversight inherent in a properly entered decree helps attain that end." *Donaghy*, 933 F.2d at 1459. Here, both aspects – contractual and judicial – weigh in favor of giving real effect to the City's admission of past discrimination.

A party can also demonstrate a strong basis in evidence by showing that a court made a finding of past discrimination. *Wygant*, 476 U.S. at 289; *see also Boston Police Superior Officers Fed'n v. City of Boston*, 147 F.3d 13, 20 (1st Cir. 1998) (explaining that a "strong basis" in evidence can be based on a "contemporaneous or antecedent finding of past discrimination by a court or other competent body") (citation omitted). As recounted above, the district court made several findings of discrimination prior to 1977 against the City. During its review of the consent decree in 1977, the district court concluded that the record supported the City's admission of a history of race discrimination within the CPD. It subsequently reaffirmed this position by entering the ACD as a judgment of the court in 1984.

A review of the statistical evidence also supports the City's admission and the district court's findings of discrimination. While evidence of "mere statistical disparities" is not enough by itself to show a compelling interest, *Associated Gen. Contractors*, 214 F.3d at 736 (citing *Croson*, 488 U.S. at 501-02), a *prima facie* case of discrimination can be made where "a *gross disparity* exists between the expected percentage of minorities selected [for hire] and the actual percentage of minorities selected [for hire]," *United Black Firefighters*, 976 F.2d at 1011 (emphasis added); *see also Croson*, 488 U.S. at 509 (plurality op., O'Connor, J.) (explaining that a *prima facie* case of

14

discrimination can arise "[w]here there is a significant statistical disparity between the number of qualified minority contractors willing and able to perform a particular service and the number of such contractors actually engaged by the locality or the locality's prime contractors"); *Aiken*, 37 F.3d at 1163 ("It is settled that *appropriate* statistical evidence setting forth a *prima facie* case of discrimination is sufficient to provide a strong basis in evidence to support a public employer['s] affirmative action plan.") (internal quotations omitted; emphasis in original); *Vogel*, 959 F.2d at 599 ("Evidence of wide statistical disparities . . . may justify an affirmative action policy adopted by a public employer.") (citation omitted).

The record is replete with gross statistical disparities between the treatment of minorities and non-minorities by the CPD. For example, the district court found that in the 1970s, minorities constituted 23% of those taking the entrance examination, but represented 64% of those who failed. Minorities had a failure rate of 26.3% compared to a rate of 4.5% for non-minorities. *Shield Club*, 370 F. Supp. at 253. Throughout the 1970s, 1980s, and early 1990s, the percentage of minorities in the CPD officer force tracked below – often quite significantly – the level of minorities in the general population, the percentage of examination takers who were minorities, and the percentage of examination passers who were minorities. This court has found that similar disparities supported a finding of racial discrimination. *See, e.g.*, *Vogel*, 959 F.2d at 600.

Appellants cite to this court's decision in *Middleton* for support of their position that the statistical disparities do not warrant a finding of compelling interest. That case is distinguishable on a number of important points. First, as the court noted at the very beginning of its analysis, the City of Flint's plan was not presented as part of a motion for a judicially approved consent decree, but rather was voluntarily conceived as part of the normal political process. *Middleton*, 92 F.3d at 401. Thus, there was no heightened judicial review of the plan before its implementation nor any

15

prior judicial findings of discrimination. The city relied upon general population statistics rather than also considering the relevant labor pool. *Id.* at 406-08. The court was further concerned about several serious deficiencies in the city's expert statistical analysis. *Id.* None of these shortfalls exist here.[6]

Appellants also argue that even if there was a compelling interest justifying the race-based remedy in 1977 and 1984, surely there was no such interest in 1993 and 1994. As evidence, they point to the convergence of the CPD's minority police force percentage to the 33% target. Yet, in determining whether the governmental body had a compelling interest, a reviewing court should focus on the evidence of discrimination existing at the time the body enacted the race-based remedy. *See Shaw v. Hunt*, 517 U.S. 899, 910 (1996) (holding that "the institution that makes the racial distinction must have had a strong basis in evidence to conclude that remedial action was necessary, *before* it embarks on an affirmative-action program.") (internal quotation omitted, emphasis in original); *In re City of Memphis*, 293 F.3d 345, 350-51 (6th Cir. 2002) (noting same). This and other courts have "considered evidence of prior discrimination occurring years before" enactment of a race-based remedy, sometimes finding the evidence convincing, *see, e.g.*, *Vogel*, 959 F.2d at 600 (considering evidence of discrimination nine years before affirmative action plan instituted; upheld plan), *Stuart v. Roache*, 951 F.2d 446, 453 (1st Cir. 1991) (considering evidence of discrimination ten years before affirmative action plan instituted; upheld plan), and other times finding it

---

[6]This court's decision in *Long v. City of Saginaw* is likewise distinguishable. In that case, we reversed a district court's grant of summary judgment to city officials over an amendment to the city's race-based hiring plan for its police department. 911 F.2d 1192 (6th Cir. 1990). We found that there was no compelling interest for the plan because, in part, there had never been a complaint of discrimination lodged against the city, nor had there been any adjudication or formal findings of discrimination against the city in its hiring of officers. *Id.* at 1197. Without some record of discrimination, we concluded that the city's admission against interest was insufficient by itself to justify the remedial measures. *Id.* at 1198. The city's statistical evidence also suffered from numerous defects which are not present here. *Id.* at 1199-200.

16

unconvincing, *see, e.g.*, *Brunet*, 1 F.3d at 409 (finding evidence of discrimination 14 years before enactment of affirmative action plan "too remote"). Here, the historical and contemporaneous evidence of discrimination in the 1970s and 1980s provided the *Shield Club* parties and the district court with a strong basis in evidence for the necessity of the original consent decree in 1977 and its amendment in 1984.

Finally, a valid race-based remedy is not limited to alleviating the current practice of racial discrimination, but can also address the "lingering effects" of such discrimination. *See Adarand*, 515 U.S. at 237; *see also Dean v. City of Shreveport*, 438 F.3d 448, 456-57 (5th Cir. 2006) (explaining that courts should consider whether "lingering effects of past discrimination still necessitate a race-conscious remedy") (citing *Paradise*, 480 U.S. at 169-70; *Police Ass'n of New Orleans v. Cannatella*, 100 F.3d 1159, 1168-69 (5th Cir. 1996)). This is necessarily the case in which the race-based remedy extends beyond the immediate moment into the future, when presumably the *practice* of discrimination has halted, but its *effects* are still felt. As discussed in more detail *infra* Sections II.E.2 and 4, the vestiges of racial discrimination had not been sufficiently relieved by 1992 and therefore the City defendants remained bound by the terms of the ACD.

Thus, with the admission by the City of past racial discrimination, supported by the findings of the district court and a review of the statistical evidence, the City defendants have shown convincing evidence of a compelling interest in increasing the number of qualified minorities among the CPD's ranks. We now turn to determine whether the City defendants crafted a measured, narrow remedy designed to attain that end.


E.      **Narrowly Tailored Remedy**

As explained by the Supreme Court, "[t]he purpose of the narrow tailoring requirement is

17

to ensure that 'the means chosen "fit" th[e] compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype.'" *Grutter*, 539 U.S. at 333 (quoting *Croson*, 488 U.S. at 493).  There is no single "best" remedy – courts and other government bodies enjoy some discretion in remedying racial discrimination. *Paradise*, 480 U.S. at 185 ("While a remedy must be narrowly tailored, that requirement does not operate to remove all discretion from the District Court in its construction of a remedial decree."); *Donaghy*, 933 F.2d at 1461 (noting that "there is no universal answer to the problem of remedying racial discrimination" and that trial courts have sound discretion in fashioning remedy).  Yet, as the district court in the *Shield Club* case succinctly noted, "[o]nly tough choices, each freighted with some weakness and the risk of individual or group inequities" face the body charged with remedying past discrimination. *Shield Club*, 370 F. Supp. at 254.

In determining whether the City's race-based remedial measure was narrowly tailored, the court must look to the following factors: "the necessity for the relief and the efficacy of alternative remedies; the flexibility and duration of the relief, including the availability of waiver provisions; the relationship of the numerical goals to the relevant labor market; and the impact of the relief on the rights of third parties." *Paradise*, 480 U.S. at 171 (citation omitted).  These are not elements – the ACD need not satisfy each and every item to survive strict scrutiny. *See Ashton v. City of Memphis*, 49 F. Supp.2d 1051, 1056 (W.D. Tenn. 1999).  Rather, after reviewing the ACD in light of all the factors, the court must be satisfied that the remedy is narrowly tailored to meet its remedial purpose. *See id.*  Moreover, the fact that the ACD was reviewed and approved by the district court weighs in favor of finding that it was narrowly tailored. *See Donaghy*, 933 F.2d at 1459 (finding relevant the "heightened judicial oversight" of the affirmative action plan in determining whether it was narrowly tailored).

18

1.      **Necessity for the Race-Based Remedy and Efficacy of Alternative Remedies**

To determine whether the CPD's race-based hiring plan was necessary, it is important to consider first the goal of the plan. The parties in the *Shield Club* lawsuits (by agreeing to the consent decree) and the district court (by entering the decree as a judgment) intended to ameliorate the effects of the City's past racial discrimination against African-Americans and Hispanics by temporarily increasing the number of these minorities hired as police patrol officers. Accordingly, the plan was appropriately focused on only the group of minorities proven to have been subjected to discriminatory practices. *Croson*, 488 U.S. at 506-07 (explaining that remedy must be "linked to identified discrimination" and not suffer from "gross overinclusiveness").

Appellants argue, however, that application of the remedial plan in 1993-1994 was not necessary for two reasons. First, Appellants argue that its application was not necessary in light of the City's use of job-validated examinations and screening procedures for a number of years prior to 1993-1994. They also assert that the CPD hired "substantially more than the number of minorities between 1985 and 1992 than required by the terms" of the ACD. Given this, Appellants maintain, the plan was unnecessary in 1993-1994 to eradicate any remaining vestiges of discrimination. Both arguments fail on close examination.

A job-validated examination "identifies those skills important to a particular job and tests those skills." *Brunet*, 1 F.3d at 394. The use of validated, non-discriminatory hiring procedures can, under certain circumstances, be an acceptable alternative to race-based relief. *See Aiken*, 37 F.3d at 1164. For example, when a governmental body makes decisions based solely on the rank-order results from a job-validated examination, the race of the examination taker will not factor into the hiring decision. Over time, the effects of past discrimination should eventually dissolve away as the effects of the meritocracy begin to dominate.

In this case, however, the job-validated examinations and screening procedures were not effectively remedying the effects of past discrimination at the time the City entered the ACD. Although the patrol officer examination was validated in 1974, by 1984 the City's proportion of minority officers had only reached 20.8%. The 3:4 hiring ratio simply sped up the City's progress towards achieving its goal of a police workforce made up of 33% minority officers. The Supreme Court has held that hiring ratios are permissible as a means to regulate the speed of progress towards fulfilling a race-based plan's goal. *Paradise*, 480 U.S. at 179-80.[7]

In support of its second argument, Appellants point out that the City hired an average of 84.6 police patrol officers per year during the 1985-1992 period, exceeding the ACD's annual minimum of 70 officers. By application of the 3:4 hiring ratio, this meant that the CPD hired more minorities (on average) than it would have if it had hired only 70 officers per year during that period. Thus, according to Appellants, there was no need for the remedial measures in 1993-1994.

As recognized by the district court, however, there is no basis in the ACD for this calculation. Appellants contest here the *interpretation* of the ACD, rather than its constitutionality. Although they have standing to challenge the ACD's constitutionality, *Rutherford*, 137 F.3d at 911, as non-parties to the decree, they do not have standing to enforce their understanding of its terms, *Aiken*, 37 F.3d at 1167-68; *Vogel*, 959 F.2d at 598. The City defendants were bound to follow the terms of the ACD, not some hypothetical plan now suggested by the Appellants. *See W.R. Grace & Co. v. Local Union 759, Int'l Union of The United Rubber, Cork, Linoleum & Plastic Workers*, 461 U.S. 757, 766 (1983) ("It is beyond question that obedience to judicial orders is an important

---

[7]We also point out that the that the CPD did not hire police patrol officers based purely on their examination score rankings – it had a measure of discretion in choosing candidates by operation of the 1:3 rule. Thus, there is no guarantee that use of a validated examination alone would have ameliorated the past effects of racial discrimination in the workforce.

public policy. An injunction issued by a court acting within its jurisdiction must be obeyed until the injunction is vacated or withdrawn.") (citation omitted)).

Moreover, a brief review of Appellants' argument shows that it is without merit. The CPD continued to operate under the ACD in 1993-1994 because it failed to hire 70 officers in two different years during the initial 8-year period. Appellants are correct that, even with this two-year shortfall, the average number of officers hired per year exceeded 70. Thus, under their argument, the fact that the consent decree extended the 3:4 hiring ratio for two years even though the average hires exceeded 70 per year shows that the decree was not narrowly tailored.

Other than pointing to the average annual-hire figure, Appellants do not show how the 70-officer minimum rule somehow violates the constitution. In fact, had the ACD included a rule consistent with Appellant's position – i.e., that the average number of hires per year should control – such a rule could have plausibly extended the race-based hiring plan well beyond the original expiration date, thus making the ACD more, not less, susceptible to attack on "narrowly tailored" grounds.[8,9]

---

[8]To illustrate, assume 75 police officers were hired each year from 1985 to 1991; however, in 1992, assume the City placed a freeze on all officer hiring for one year. Also assume that from 1993 forward, the CPD again hired 75 officers per year. Under the ACD, the 3:4 hiring ratio would have been extended for one year. Under a rule in which the average must be 70 in the final year for the decree to expire, however, it would take 15 years, beginning in 1985, for the average to reach 70.

[9]In his concurring opinion, Judge Rogers states that the ACD was "open-ended depending on the actions of the City," and concludes that "[a] consent decree that permits affirmative action as an ongoing option, rather than as a limited requirement, should not so easily be maintained by relying on the discriminatory situation faced at the time of the original decree." In this particular case, however, we find that the minimum-70-officer rule made sense for several reasons, including: (a) the possibility of financial hardships causing the City to fall short in remedying past discrimination (which was one of the reasons for amending the original consent decree); and (b) the possibility (given the City's prior history of discrimination) that the City might try to thwart the goals of the consent decree by simply freezing hiring or hiring only a relatively few number of officers during the eight-year period of the consent decree. *See, e.g.*, *McNamara v. City of Chicago*, 138 F.3d 1219, 1223 (7th Cir. 1998) (noting hiring freeze by the city immediately after it agreed to hire a higher

21

## 2.    Duration of Race-Based Remedy

Appellants next argue that the remedial measures extended too far in time in comparison with the discrimination the measures were meant to remedy.  Courts view with disfavor those affirmative action plans that are not temporary and do not terminate when the identified racial imbalances have been eliminated. *See, e.g.*, *Aiken*, 37 F.3d at 1164; *Detroit Police Officers Ass'n v. Young*, 989 F.2d 225, 228 (6th Cir. 1993); *Paradise v. Prescott*, 767 F.2d 1514, 1531 (11th Cir. 1985).  As this court has noted, "[n]arrow tailoring . . . implies some sensitivity to the possibility that a [race-based] program might someday have satisfied its purposes." *Associated Gen. Contractors*, 214 F.3d at 737.  It is also important to understand, however, that "[r]emedial action takes time . . . and discrimination may linger for many years in an organization." *Boston Police*, 147 F.3d at 20 (internal quotations omitted).

To determine whether the length of any race-based hiring plan is properly attuned with the workforce shortfall caused by discrimination, the reviewing court should consider the extent of the shortfall and the reasonable likelihood that it will be ameliorated promptly.  Unlike some other plans struck down or questioned by this court,[10] the ACD was not intended to be a long-term or permanent remedy, as it contained a flexible, self-executing sunset provision.  This provision ensured that the decree would last no longer than necessary to remedy (or approach remedying) the workforce minority shortfall caused by past racial discrimination.  The decree further provided for an

percentage of minorities for fire department; when freeze ended, percentage of minorities remained unchanged).  While the reasonableness of the rule does not, by itself, make the decree narrowly tailored, it is certainly a factor in its favor.

[10] *See, e.g.*, *Assoc. Gen. Contractors*, 214 F.3d at 737-38 (noting with disapproval the lack of a sunset provision in legislation providing racial preferences in state contracts); *Aiken*, 37 F.3d at 1164 (finding that the city's failure to make any effort to limit the duration of remedy "cut[] against" finding it was narrowly tailored).

22

automatic, temporary extension in the event that: (a) the CPD did not hire at least 70 officers in any particular year; and (b) the 33% target had not yet been met. In this case, the plan continued for slightly less than two years as a result of this provision. Thus, this is not a plan which was "timeless in [its] ability to affect the future." *Wygant*, 476 U.S. at 276.

Appellants point to the fact that in 1992, the percentage of minorities in the CPD (29.6%) was closely approaching the 33% target. They assert that the CPD had substantially met the target, and therefore the ACD's continuation into 1993-1994 was unjustified. This argument would be stronger if the workforce convergence had occurred in the beginning or middle of the plan's intended duration, rather than near the end. Of course, *any* responsible race-based hiring plan should have as its ultimate goal the attainment of the target at the natural end of the life of the plan. The fact that the percentage of minorities on the CPD's police force was approaching the 33% target near the end of the plan is a testament to the plan's efficacy, not its unconstitutionality. Furthermore, the fact remains that although the ACD was successful in increasing the percentage of minorities in the CPD, the 33% target was not met until mid-1994. Once the target was met, the plan terminated of its own accord and did not reach beyond the length of time necessary to alleviate the remaining vestiges of identified discrimination.

### 3.     Flexibility and Impact on Third Parties

Appellants next claim that the City's affirmative action plan did not contain sufficient flexibility. On the contrary, the ACD included several provisions giving the CPD flexibility in hiring officers. First, the decree precluded the City from hiring unqualified minority applicants. This is an important feature of any well-designed race-based hiring plan. *Vogel*, 959 F.2d at 599 (noting with approval that the affirmative action plan required "the hiring only of *qualified* blacks

23

and women; it [did] not require the selection of unqualified blacks or women over qualified white males" (emphasis in original)). The City graded the examinations blindly, without reference to the race of applicants. If qualified minority candidates were not available from a given list, the decree provided that another entrance examination be offered and lists of qualified candidates be drawn from that separate examination. Appellants have provided no evidence that the CPD hired unqualified candidates in contravention of the decree.

Nor did the decree mandate that the CPD had to hire a certain number of minorities each and every year. The 70-officer minimum rule gave the CPD the option of hiring fewer than 70 officers in a given year if, for example, there was an insufficient number of qualified candidates that year. The CPD could then make up this shortfall in a later year, if necessary. This feature provided the CPD with flexibility in meeting its hiring needs with only qualified candidates. *See Paradise*, 480 U.S. at 177-78 (noting with approval a similar measure).

Furthermore, the decree did not require that incumbent non-minorities be terminated to make room for minority applicants. Of course, "initial employment opportunities coupled with hiring goals may burden some innocent individuals." *Vogel*, 959 F.2d at 599 (quoting *Long*, 911 F.2d at 1196-97). This type of remedy, however, does "not impose the same type of intrusive injuries that layoffs, which result in loss of job expectancy, security, and seniority, involve." *Id.*; *see also Paradise*, 480 U.S. at 182-83 (noting with approval that 1:1 hiring requirement did not require layoff and discharge of non-minority employees); *Wygant*, 476 U.S. at 283 (finding that the denial of future employment is not as intrusive as the loss of an existing job). Finally, non-minorities were not barred from hire – the CPD maintained separate lists of qualified minority and non-minority candidates and hired candidates from both lists. *Vogel*, 959 F.2d at 599 (noting with approval that affirmative action plan did not "present a complete bar to non-minorities"). With these provisions,

24

the ACD contained sufficient flexibility with minimal impact on third parties to meet equal protection concerns.

**4.       Relationship of Numerical Target with Relevant Labor Market**

The court must also consider the relationship between the ACD's numerical target and the relevant labor market. The "relevant labor market" is defined as the number of minority applicants who were actually qualified for the job – the "qualified labor pool." For jobs requiring no special qualifications, the relevant labor pool is often simply the pool of minorities within the local general population. *See Croson*, 488 U.S. at 501. The CPD requires special qualifications for its police patrol officers, however, such as passing entrance and physical examinations, psychological and medical evaluations, and a background investigation. Accordingly, the court must look to the pool of minorities actually qualified to be police patrol officers when comparing this pool to the 33% target. *See id.* at 501-02 (noting that "where special qualifications are necessary, the relevant statistical pool for purposes of demonstrating discriminatory exclusion must be the number of minorities qualified to undertake the particular task").

The parties offer two different definitions of the qualified labor pool: (a) of those people who qualified to take and actually *took* the examination, the percentage who were minorities (the City defendants' qualified labor pool); and (b) of those people who *passed* the examination, the percentage who were minorities (Appellants' qualified labor pool). While both proposed definitions find support in the record, the distinction between the two proffered definitions is, in this case, one without a difference. Even under Appellants' stricter definition, there is a sufficiently close relationship between the qualified labor pool and the ACD's numerical target.

There exists no set formula for determining whether the 33% target fits "close enough" to the qualified labor pool. The question, rather, is whether the target represents "a plausible lower-bound estimate of a shortfall in minority representation" among the CPD resulting from racial discrimination. *McNamara*, 138 F.3d at 1224 (citing, among other cases, this circuit's decision in *Aiken*, 37 F.3d at 1165). The parties provide minority examination flow data for four separate years: 1982, 1989, 1992, and 1994. The percentage of examination passers who were minorities range from a low of 30.6% to a high of 47.3% (the percentage range of minority examination takers equals 41.0% to 52.3%). Specifically, the percentage of passers in 1982 who were minorities was 47.3%; in 1989, 45.6%; in 1992, 30.6%; and 1994, 33.7%.

Appellants point to the fact that in 1992, the percentage of passers who were minorities (30.6%) was almost identical to the percentage of minorities on the police force (29.6%). The year-to-year fluctuations in the qualified labor pool, however, are of little to no relevance to whether the plan was narrowly tailored. While there may be long-run demographic trends which drive the average of the percentage of examination passers who are minorities close to 33% (or, more likely, a higher percentage equal to the percentage of minorities residing in the City), there is nothing to suggest that the examination pass rate in 1992 had any direct or causal relationship to the minority police force figure of that same year. The annual pass rates undoubtedly exhibited a certain element of randomness from year-to-year, while the minority police force percentage was being driven to 33% by operation of the 3:4 hiring ratio.

The better comparison in this case is between the ACD's target of 33% and the *range* of minority examination passers over the years. Given that the annual pool of qualified candidates from which the CPD had to choose ranged between 30.6% to 47.3% minority candidates (using the

26

Appellants' more conservative definition) over the relevant years, a workforce target of 33% was sufficiently related to the qualified labor pool, if not a bit conservative.

The fact that the 33% target was at the lower bound of the conservative qualified labor pool further illustrates that the 29.6% minority workforce in 1992 was not "close enough" to the target for the CPD to have ignored the terms of the ACD and stopped using the 3:4 hiring ratio in 1993-1994. The standard is not whether the CPD had come close to satisfying the terms of the ACD, but rather "whether the vestiges of past discrimination had been eliminated *to the extent practicable*." *Jansen*, 977 F.2d at 244 (quoting *Bd. of Educ. of Oklahoma City Pub. Sch. v. Dowell*, 498 U.S. 237, 250 (1991)) (emphasis added). Certainly, the percentage of minorities in the CPD workforce was increasing throughout the 1980s and early 1990s. Even so, the CPD had not yet reached the 33% target, the level at which the parties agreed, the district court approved, and we confirm, was a reasonable lower-bound measure of the relevant qualified labor pool. Within the context of the ACD as a whole – a temporary plan, the City's admitted history of discrimination, and a modest target – we find that the CPD did not err in following the terms of the ACD in 1993-1994 even though it was approaching the target in 1992.

Finally, Appellants take issue with the 3:4 hiring ratio, arguing that the rate of hire (42.9%) far exceeded the 33% target. As a matter of simply comparing the percentages, they are correct. Yet, Appellants ask us to compare apples to oranges. The 33% figure represents the CPD police force minority target; the 3:4 hiring ratio represents the speed to which the target was to be met. As explained *supra* Section II.E.1, there is nothing unconstitutional about the 3:4 hiring ratio as a reasonable rate of hire to meet the 33% minority workplace target. *Paradise*, 480 U.S. at 179-80 (approving 1:1, or 50%, hiring rate to meet 25% minority workplace target).

**F.     The ACD Satisfies Equal Protection Concerns**

Given the modest workforce target, the sunset provision, and the various flexibility provisions, we find that the ACD was narrowly tailored to remedy the City's past discrimination against minorities.  The City defendants did not violate the Appellants' rights under the Equal Protection Clause or Title VII of the Civil Rights Act by following the ACD in 1993-1994.[11] Accordingly, the district court properly granted judgment to the City defendants on these claims.

**G.     Appellants' Disparate Treatment Claims**

In addition to their claim that the ACD, as a whole, violated their constitutional and statutory rights, several of the individual Appellants also argue that they faced disparate treatment by the City defendants.  Specifically, they argue that the CPD's use of the 1:3 rule shielded less-qualified minority applicants from competition against them.  They also allege they were victims of reverse discrimination because the City defendants used background checks and selection procedures against them in a disparate manner.

Appellants do not suggest here that any of the minority candidates hired in 1993 or 1994 were not qualified.  They insist, rather, that for various reasons they were *more* qualified than some of the minority candidates who were ultimately hired.  As explained by the district court, however, "[d]egrees of qualification" are not the proper focus here.

As already discussed, rather than relying on a pure rank-order rule, the City hired officers using the 1:3 rule in conjunction with separate minority and non-minority candidate lists.  Thus, within the framework of the 1:3 rule, minorities were compared against other minorities, and non-

---

[11]Although a public employer's obligations under the Equal Protection Clause and Title VII are not identical, *Brunet*, 1 F.3d at 405, Appellants have not argued that their Title VII claims relating to the ACD's application in 1993-1994 differ in any way from their equal protection claims.

28

minorities were compared against other non-minorities.[12]   Any leniency afforded minority

candidates on the minority eligibility list would affect only other minority candidates, and not the

individual Appellants.  It is only when one steps outside the 1:3 framework and views the ACD as

a whole that it can be said that Appellants were treated differently than minority candidates.  Yet,

as explained above, the different treatment of minority and non-minority candidates under the

remedial hiring plan met constitutional muster.

On Appellants' claim of reverse discrimination based on the City's background checks and

screening procedures, the district court correctly found that Appellants failed to show that the CPD

was "that unusual employer who discriminates against the majority." *Murray v. Thistledown Racing

Club, Inc.*, 770 F.2d 63, 67 (6th Cir. 1985) (citation omitted).  Appellants were not similarly situated

to minorities who were allegedly treated more favorably.  Accordingly, the district court properly

granted summary judgment to the City defendants on Appellants' disparate treatment claims.

### III.  CONCLUSION

For the reasons provided above, we AFFIRM the district court's grant of summary judgment

in favor of the City defendants.

---

[12]This feature distinguishes the present case from *Voels v. New York*, 180 F. Supp.2d 508 (S.D.N.Y. 2002), relied upon by Appellants in their reply brief.  The government actor in that case also used a 1:3 hiring rule, but with the critical difference being that separate lists of minorities and non-minorities were not maintained.  Thus, in any group of three, minorities and non-minorities were likely competing directly against each other.

**KAREN NELSON MOORE, Circuit Judge, concurring.** I join in the majority's opinion but write separately to respond to the concurring opinion's suggested narrowing of the category of individuals entitled to relief due to past discrimination. The concurring opinion could be read to state that only a plan benefitting those individuals who suffered discrimination themselves or who were "around at the time the discrimination took place" will survive strict scrutiny analysis; it further states that "a limited remedy of, for example, up to 10 years" would be permissible for the latter group. Concurring Op. at 1-2. This part of the concurrence is based upon the following statement from *City of Richmond v. J. A. Croson Co.*, 488 U.S. 469, 508 (1989): "But the interest in avoiding the bureaucratic effort necessary to tailor remedial relief to *those who truly have suffered the effects of prior discrimination* cannot justify a rigid line drawn on the basis of a suspect classification." (emphasis added). However, *Croson* does not imply that those who suffer the *effects* of prior discrimination must have been "around at the time the discrimination took place." Such a conclusion would fail to acknowledge the key distinction between eliminating facially discriminatory policies and the continuing effects of historically institutionalized racial discrimination; it would also fail to acknowledge that ten years will often be an unrealistic amount of time in which to eradicate the effect of years — often many decades — of discrimination. "As long as significant specified effects linger, affirmative action may be justified despite the implementation of valid selection procedures. Public employees cannot escape their constitutional responsibilities merely by adopting facially-neutral policies that institutionalize the effects of prior discrimination and thus perpetuate *de facto* discrimination." *Ensley Branch, NAACP v. Seibels*, 31 F.3d 1548, 1575 (11th Cir. 1994) (citing *United States v. Fordice*, 505 U.S. 717, 729 (1992)).

30

**ROGERS, Circuit Judge, concurring.** I concur entirely in the majority opinion. I write separately to acknowledge two troubling aspects of our decision, and to identify an additional consideration supporting our judgment.

Between 1972 and 1977, the City defended a lawsuit in which the Shield Club argued that the City had discriminated in its hiring, transfers, and promotions of minority police officers. The City maintained throughout that it had never discriminated against minorities. Nevertheless, after years of litigation and findings of intentional discrimination by the district judge, the City entered into a consent decree governing hiring and promotions within its police department.

In 1984, the Shield Club moved to modify and extend the consent decree. The City opposed the motion, but it ultimately agreed. A decade later, despite faithfully following the terms of the ACD, the City once again was forced to defend against allegations of racial discrimination when the appellants brought the present lawsuit in May 1994, just one month before the ACD reached its goal in June 1994. This time, however, the City was targeted not for discriminating against minorities, but for discriminating against nonminorities by following the terms of the ACD. The plaintiffs argued that the ACD should not have been extended beyond 1992, and thus that the City had been acting illegally for the subsequent year and a half in complying with the ACD.

Had this case instead been brought in 1992 to modify or terminate the consent decree, the reasoning of the majority opinion might well have supported continuation of the decree. Two factors, however, give me pause in reaching that conclusion.

First, the ACD arguably had been in place too long to be narrowly tailored. In an affirmative action plan seeking to remedy past discrimination, there are essentially three possible groups that stand to benefit: (1) those actually discriminated against, (2) those not actually discriminated against but who are members of the same group as those discriminated against and who were around at the

31

time the discrimination took place (justifying a limited remedy of, for example, up to 10 years), and (3) other members of that group at any time (as an extreme example, 75 years after the discrimination). In this case, the minority recruits are mostly members of the third group because few of them would have been old enough to be hired as a police officer when the discrimination took place in the 1970s.

In *City of Richmond v. J.A. Croson Co.*, the Supreme Court's analysis brings into question whether a plan benefitting only group three survives strict scrutiny:

> [T]he Richmond Plan's waiver system focuses solely on the availability of MBE's; there is no inquiry into whether or not the particular MBE seeking a racial preference has suffered from the effects of past discrimination by the city or prime contractors.

> Given the existence of an individualized procedure, the city's only interest in maintaining a quota system rather than investigating the need for remedial action in particular cases would seem to be simple administrative convenience. But the interest in avoiding the bureaucratic effort necessary to tailor remedial relief to *those who truly have suffered the effects of prior discrimination* cannot justify a rigid line drawn on the basis of a suspect classification.

488 U.S. 469, 508 (1989) (emphasis added). In addition, Justice Stevens noted:

> The class of persons benefitted by the ordinance is not, however, limited to victims of such discrimination—it encompasses persons who have never been in business in Richmond as well as minority contractors who may have been guilty of discriminating against members of other minority groups. Indeed, for all the record shows, all of the minority-business enterprises that have benefitted from the ordinance may be firms that have prospered notwithstanding the discriminatory conduct that may have harmed other minority firms years ago.

*Id*. at 515 (Stevens, J., concurring). Similarly, the minority recruits that benefitted from the ACD extension were hired even though they may have never suffered from the effects of racial discrimination. Of course, on the other hand, it is impossible to know who would have been hired under a nondiscriminatory system when, during the pendency of the consent decree, a separate

32

remedial quota system was in place. Perhaps some of the young minority beneficiaries of the ACD in the early 1990s who would not have been hired without the ACD would have been hired had there never been any discrimination.

Second, the consent decree was open-ended depending on the actions of the City. By continually hiring fewer than seventy police officers per year, the City could have extended the ACD indefinitely. A consent decree that permits affirmative action as an ongoing option, rather than as a limited requirement, should not so easily be maintained by relying on the discriminatory situation faced at the time of the original decree. The reasonableness of the 70-per-year rule in terms of protecting minorities from city evasion of consent decree requirements does not necessarily imply that the rule is narrowly tailored for purposes of protecting the interests of nonminority applicants adversely affected by the decree.

While these considerations may in the end not have been sufficient to warrant modification of the ACD two years before it reached its goal, they at least raise serious concerns as to whether the decree continued to be narrowly tailored at that point. We do not need to resolve the issue because, in my view, a somewhat more deferential approach is required when, instead of moving to modify the decree, the officers sued after the fact for retroactive relief based on the failure of the City to violate the decree.

To award damages against the City because it failed to violate a consent decree would be troubling for a number of reasons. First, it would be inequitable to force the City to pay damages for faithfully implementing the affirmative action plan that it had challenged for years in court. The case would be different if the City entered into a consent decree that was clearly illegal at the time, or if the City subsequently ignored a new decision or statute that made it clear that its conduct was illegal. But when the City entered into the ACD, the Supreme Court had yet to announce in *Croson*

33

that strict scrutiny should be used in evaluating state and local affirmative action programs. *See* 488 U.S. at 493-94. There is little doubt that, in 1984, the affirmative action program was legal under existing caselaw. Even after *United States v. Paradise*, 480 U.S. 149 (1987), *Croson*, and subsequent cases were decided, it was not immediately clear that the extension of the ACD was unconstitutional.

Second, permitting retrospective relief would place parties like the City in a problematic legal position. A party is bound by a court order even if the party strongly disagrees with the order. If we award damages for failure to violate a court order, we are in some sense telling the party that it should have violated the order. Perhaps when compliance with a court order clearly violates the constitutional rights of third parties, a party should violate the order and use its legal position to defend the enforcement of contempt sanctions against it. But where the illegality of the order is not so clear, certainly a party ought to comply. This shows the respect for the system that is necessary on the part of responsible participants in our ordered republic.

Instead of violating a court order perceived to be illegal, a party should generally litigate to modify the order. One might certainly argue that the City should have sought a modification of the ACD as soon as the argument became tenable that the decree was not narrowly tailored. But such an obligation to seek to modify cannot require a litigant (here the City) to challenge a decree continuously during its pendency. Such an obligation also arguably disrespects the system, especially where the judicial order resulted from vigorous litigation, as here, and where the change in factual and legal circumstances was not clearly marked. Thus, for us to reverse the district court in this case and impose retrospective relief for failure to violate the decree, we should determine not only that the decree would properly have been modified had modification been timely sought, but also that the unconstitutional nature of compliance with the decree was sufficiently clear to the City

34

as to require the City to have returned to court in 1992 to lift the decree. In my view, for the reasons given in the majority opinion, we cannot say that the ACD was so clearly unconstitutional as to require the City sua sponte to have sought modification in 1992, and we need not decide the closer question of whether such a modification would have been required had it been sought by the officers at the time.