RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 12a0022p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

No. 00-00301
CLEVELAND FIREFIGHTERS FOR FAIR HIRING
PRACTICES, et al.; CLEVELAND FIREFIGHTERS,
LOCAL 93 IAFF,

     *Plaintiffs-Appellees,*

  *v.*

CITY OF CLEVELAND, et al.,

     *Defendants.*


No. C73-00330
LAMONT C. HEADEN; SHERMAN E. KITCHEN;
JERRY L. LETT; HARNED R. GAITOR,

    *Plaintiffs-Appellants,*

VANGUARDS OF CLEVELAND,

    *Intervenor Plaintiff-Appellant,*

  *v.*

CITY OF CLEVELAND, et al.,

    *Defendants-Appellees.*

No. 09-4208

_____

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 00-00301—Donald C. Nugent, District Judge.

Argued: March 10, 2011

Decided and Filed: January 27, 2012

Before: KEITH, McKEAGUE, and KETHLEDGE, Circuit Judges.

1

———————————

**COUNSEL**

**ARGUED:** E. Richard Stege, Jr., STEGE & MICHELSON CO., LPA, Cleveland, Ohio, for Appellants. Andrew P. Fleming, CHIACCHIA & FLEMING, LLP, Hamburg, New York, Kevin J. Gibbons, CITY OF CLEVELAND, DEPARTMENT OF LAW, Cleveland, Ohio, for Appellees **ON BRIEF:** E. Richard Stege, Jr., STEGE & MICHELSON CO., LPA, Cleveland, Ohio, for Appellants. Andrew P. Fleming, CHIACCHIA & FLEMING, LLP, Hamburg, New York, Kevin J. Gibbons, CITY OF CLEVELAND, DEPARTMENT OF LAW, Cleveland, Ohio, Daniel A. Powell, Thomas M. Hanculak, LAW OFFICES OF JOSEPH W. DIEMART & ASSOCIATES, Cleveland, Ohio, for Appellees.

KETHLEDGE, J., delivered the opinion of the court, in which McKEAGUE, J., joined. KEITH, J. (pp. 10–31), delivered a separate dissenting opinion.

———————————

**OPINION**

———————————

KETHLEDGE, Circuit Judge. At most the Constitution barely tolerates a public employer's decision to hire or reject a job applicant based upon her race. Race-neutrality is the promise of the Equal Protection Clause; and the law permits a public employer to depart from that rule only reluctantly, in circumstances limited in both scope and duration. Namely, a public employer can hire or reject applicants based upon their race only to the extent, and only so long as, its use of racial classifications serves to remedy specific instances of past discrimination by that same employer. These limitations are long settled in the law. It is the affirmative duty and province of the courts to apply them.

Here, the district court found in 1975 that the City of Cleveland had discriminated against minorities in its hiring of entry-level firefighters. In 1977, the court approved a consent decree that included racial classifications as a remedy for that discrimination. The decision before us now is the court's refusal, in 2009, to extend the life of the decree—and thus its racial classifications—for another six years. Although the court couched its decision in terms of whether the decree's provisions remained

"necessary," the question more precisely stated is whether, 31 years out, the decree's racial classifications continue to remedy past discrimination by the City's Fire Department. The district court did not make specific findings as to that question. It needs to make those findings before deciding whether to extend or terminate the decree. We vacate the court's decision and remand for it to do so.

I.

Lamont Headen and several other African-American residents of Cleveland brought a class-action lawsuit against the City in 1973 after it rejected their applications to be firefighters. At that time, African-Americans comprised 40% of the City's population but only four percent of its firefighters. After an evidentiary hearing, the district court found in 1975 that the City had unlawfully discriminated against minorities in hiring firefighters.

In 1977, the City and Headen submitted for court approval a consent decree that required the City to implement race-based criteria to remedy its past discrimination in firefighter hiring. Specifically, for each round of firefighter hiring that the City conducted, the decree required the City to hire at least the percentage of minorities who had passed the most recent entrance examination (the "*Headen* ratios"). The district court approved the consent decree. The decree was amended in 1984, but this provision remained essentially unchanged.

A more significant amendment came in 2000. In that year, the City moved to stay further execution of the decree, and a group called Cleveland Firefighters for Fair Hiring Practices (the "Cleveland Firefighters") brought a lawsuit challenging the decree's constitutionality. In response, the Vanguards of Cleveland—a minority-firefighter organization that by then had been made a party to the suit—defended the decree's constitutionality and alleged that the City had continued to discriminate against minorities. The City denied the allegation.

The district court resolved these issues by entering a second amended consent decree in September 2000. That decree recited that the percentage of minority firefighters in the City's fire department had increased to 26%. The decree established, for the first time, a goal of increasing that percentage to 33 1/3%. To that end, a related order changed the *Headen* ratios to require that at least one out of every three new hires be a minority applicant. The decree also required the City to conduct an additional three rounds of firefighter hiring (each from an "eligible list" of applicants who have passed the entrance exam) pursuant to the new *Headen* ratios. The decree required the City to conduct these additional hiring rounds by September 29, 2008, but stated that "[t]he parties understand that there may be legitimate circumstances which may prevent" the City from doing so. In that event, the decree provided, the City could petition the court for a "reasonable extension of time" to make those hires, which extension "shall be approved" if "the City has made a good faith effort to meet the September 29, 2008 deadline."

A combination of events prevented the City from hiring any new firefighters after the second amended decree was entered. Most significantly, in 2003 the Ohio Police and Fire Pension fund established a new program—known as "DROP"—whose effect was to encourage retirement-eligible firefighters to continue working. As of June 2008, 211 Cleveland firefighters had enrolled in the program, which meant the City could make 211 fewer new hires, which as a practical matter meant it could make no new hires at all. Instead, as a result of a budget crisis, the City laid off 70 firefighters in 2004. To the extent the City has hired any firefighters since then, it has only re-hired the laid-off ones.

The City recited these circumstances when it moved, on September 26, 2008, for an extension of the September 29, 2008 deadline. The Vanguards likewise moved on September 29 to "Extend the Terms of the Second Amended Consent Decree[.]" The Cleveland Firefighters opposed the decree's extension on the grounds that the decree was no longer necessary and had already been in effect for more than 30 years. These motions landed on the docket of a new district court judge, the prior judge having passed away in 2006.

The district court held an evidentiary hearing with respect to the motions in May 2009. At the hearing's end, the court requested briefing as to whether continued judicial supervision over the City's hiring of firefighters remained necessary. The parties disregarded that request. Instead, they presented the court with a proposed third amended consent decree that would extend for six more years—to December 31, 2014—the court's supervision of the City's firefighter hiring processes generally and the application of its racial classifications specifically. The court thereafter held a status conference at which it told the parties that a six-year extension of the decree was "unacceptable," and invited them to make another proposal. The parties chose not to do so.

In an order dated August 29, 2009, the district court ruled on the motions to extend. The court cited the 2000 finding that "26% of the City's firefighters were minorities," which the court said was "a significant increase from the mere 4% that was cited by Plaintiffs at the outset of this case[.]" That increase, the court found, "constitutes substantial compliance with the arbitrary, aspirational goal of 33 1/3% minority representation in the Fire Department[.]" But the court's main point was that the decree had already been in effect long enough. The court noted that the impact of its decision as to whether to extend the decree would "extend well beyond" the interests of the parties to this litigation, affecting future applicants for firefighter positions and city residents generally. The court also observed that the parties were asking it "to allow a Third Amended Consent Decree" whose term would stretch to "41 years since this case was filed in this Court." And the court found that, "[b]y all accounts, the City has devised and implemented a plan for the recruitment of minority firefighter candidates," and that "the City currently has in place a foundation that will lead to increased minority representation in the Fire Department once the economy allows for a more normal hiring process to resume." Thus, the court concluded, "judicial monitoring" of the City's hiring of firefighters "is no longer a necessity." The court therefore denied the motions to extend the decree's effective dates, and terminated the case.

This appeal followed.

II.

"We review a district court's termination of supervision and jurisdiction over a consent decree for an abuse of discretion." *Gonzales v. Galvin*, 151 F.3d 526, 531 (6th Cir. 1998). "The appellant has the burden of proof on appeal to show that there was no reasonable basis for the district court's termination order." *Id.*

The appellants here—the plaintiffs *de jure*, and the City *de facto*—attempt to meet their burden primarily by arguing that the district court's termination of the decree was contrary to the decree's terms. Although the decree itself is opaque on the point, it appears to be common ground among the parties and the district court that, absent an extension, the decree would expire by its terms on September 29, 2008. But the plaintiffs point to the second amended decree's provision that it "shall be extended" if the City has not conducted another three rounds of firefighter hiring by that date and the City has otherwise tried to comply with the decree's terms in good faith. Those prerequisites were undisputedly met here, so the plaintiffs argue that the district court's refusal to extend the decree was contrary to its terms—and thus, the plaintiffs say, unlawful. That the parties had stipulated to the extension, the plaintiffs suggest, only compounded the court's error. Thus, they contend, we should reverse the court's order terminating the decree and ourselves order the district court to enter the proposed third amended decree.

These arguments assume that the district court's role in administering a consent decree is essentially ministerial—that the court, for all time apparently, is bound to do whatever the decree says it must do. But a district court is not merely an instrument of a consent decree or of the parties' stipulations with respect to it. The court instead has discretion with respect to whether and how a consent decree shall remain in effect, including the discretion to terminate the decree altogether. *See Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 380 (1992); *Gonzalez,* 151 F.3d at 531. That discretion has limits, *see Rufo*, 502 U.S. at 383; but that a consent decree provides for its own extension does not necessarily mean that the district court must extend it. Nor

does the fact that the parties have stipulated to an extension; for, as the district court correctly recognized, institutional decrees "affect more than the rights of the immediate litigants." *Heath v. DeCourcy*, 888 F.2d 1105, 1109 (6th Cir. 1989). The question, then, is whether the termination was lawful given not only the decree's terms, but also the broader legal rules that govern consent decrees.

Some of those rules are set forth in *Gonzales*, which lays out procedural requirements that a district court must follow before terminating a consent decree. Among other things, a court should not "terminate jurisdiction over the consent decree without first making explicit findings concerning Defendants' compliance with the decree's goals and specific terms." *Gonzales*, 151 F.3d at 532. With due respect, those requirements were not met here: to the extent the court made factual findings in its order terminating the decree, they were largely conclusory; and the court otherwise did not make findings regarding the City's compliance with important aspects of the decree, such as whether the City had reevaluated its "entrance examination process." *See* 2nd Amended Decree ¶8.

The Constitution supplies some other rules. Although the district court did not style its decision as constitutional, its analysis went to a question constitutional in origin: whether the court could lawfully extend the decree's race-based measures to apply more than 37 years after they were first adopted. The district court was right to consider that question; and because (as discussed below) the court must consider it anew on remand, we lay out some principles governing that question here.

"[A]ll racial classifications must be reviewed under strict scrutiny[.]" *Parents Involved in Community Schools v. Seattle School District No. 1*, 551 U.S. 701, 741 (2007). Racial classifications in consent decrees are subject to strict scrutiny just like any other. *See Aiken v. City of Memphis*, 37 F.3d 1155, 1162 (6th Cir. 1994) (en banc). There are two racial classifications in the consent decrees here: first, the *Headen* ratios, which require that one of every three new firefighters hired by the City be non-white; and second, the decree's goal that 33 1/3% of the City's firefighters, regardless of rank,

be minorities.   2nd Amended Consent Decree ¶1.  To survive strict scrutiny, each of these classifications must be narrowly tailored to achieve a compelling governmental interest.  *Parents Involved*, 551 U.S. at 720.

"[R]emedying the effects of past intentional discrimination" is a compelling interest.  *Id.*  Here, there was undisputedly past discrimination by the Fire Department, since the district court made such a finding back in 1975.  To establish a compelling interest, however, the state actor must do more than prove past discrimination; it must show that the racial classification actually serves to *remedy* that discrimination.  In the typical case, that showing is taken almost for granted; but the typical case does not involve a racial classification that the state actor has already applied for 31 years and proposes to apply for six more.

The district court was plainly mindful of that point at the close of the May 2009 evidentiary hearing.  There, the district court requested that the parties brief the necessity of extending the consent decrees still further, stating that this issue "has to be addressed" and that "we didn't hear anything about it today."  The parties disregarded that request, instead presenting the district court with what they presumably (but quite incorrectly, as it turned out) regarded as the *fait accompli* of a third amended consent decree.  Before us, the parties now challenge the termination order on precisely the grounds that they refused to brief in the district court.  Their conduct borders on grounds for waiver.  We do not base our decision today on those grounds; but suffice it to say that the parties should have briefed the necessity of extending these classifications when the district court asked them to.

Whether a racial classification is supported by a compelling interest when first applied by a public employer, and whether it remains supported by such an interest 31 years later, are two different questions.  And thus the core issue to be resolved in this litigation is whether, 31 years out, the decree's racial classifications continue to remedy past discrimination by the Fire Department.  The questions whether the decree's goals have been met, and whether the parties have stipulated to extend its terms, are ultimately

subordinate to that core issue. The Constitution trumps a consent decree. In a case involving racial classifications very similar to the ones here, the Eleventh Circuit observed: "After thirteen years of racial preferences . . . the district court should consider the retrospective, remedial purpose of affirmative action satisfied except where it finds that past discrimination continues to taint a particular position." *Ensley Branch, N.A.A.C.P. v. Seibels*, 31 F.3d 1548, 1575–76 (11th Cir. 1994). The same is true for racial classifications that have been in effect for 31 years.

To extend their effectiveness still longer, the district court must find that the classifications continue to remedy the Fire Department's past discrimination in firefighter hiring. The district court expressed skepticism on this point—noting among other things that the classifications, if extended, would apply to applicants who had not even "been born at the time the case was filed." But the court did not make a specific finding as to whether there is "strong evidence," *Aiken*, 37 F.3d at 1163, that the decree's racial classifications would remain remedial if extended beyond the time they have already applied. The court must make a careful finding on this point before deciding whether to extend or terminate the decree. *Cf. Gonzales*, 151 F.3d at 532. We will remand the case for the district court to do so.

In this case, as in a previous one, we recognize that "racial discrimination and disadvantage exist[] at many levels of our society and in many ways." *Middleton v. City of Flint*, 92 F.3d 396, 409 (6th Cir. 1996). And our decision does not prevent the Vanguards from arguing—as they did in 2000—that the decree's racial classifications serve to remedy alleged discrimination by the Fire Department occurring after 1975. But the fact remains that the Supreme Court has laid down "particular standards as to when and to what extent race may be used by government as a factor to disadvantage some Americans at the expense of others." *Id.* Those standards must be met here if the decree's racial classifications are to apply longer than they already have.

The district court's August 20, 2009 order is vacated, and the case remanded for further proceedings consistent with this opinion.

———————————

**DISSENT**

———————————

KEITH, Circuit Judge, dissenting.  I must dissent.  This case arises out of a struggle spanning three decades to remedy a judicial finding of racial discrimination in the hiring practices of the Cleveland Fire Department. While the majority places much weight on the lifespan of the remedy, it gives short shrift to the fact that the invidious past discrimination by the Cleveland Fire Department responsible for the racial disparities among firefighters has itself operated with impunity for countless years. After three federal district judges had established the unconstitutionality of the City of Cleveland's hiring practices, all parties agreed to a remedy and memorialized their agreement in the form of a **consent decree**, signed into effect by the district court.  It is precisely the parties' consent, not the personal preference of the judge, that animates the legal force of a consent decree.  *See Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 525 (1986).  In this case, when all parties agreed to an extension of time under the express provisions of the consent decree, I find that the district court abused its discretion in denying the parties' joint motion.

A consent decree is "essentially a settlement agreement subject to continued judicial policing." *Williams v. Vukovich*, 720 F.2d 909, 920 (6th Cir.1983). Consent decrees are indeed "a strange hybrid in the law." *Brown v. Neeb*, 644 F.2d 551, 557 (6th Cir. 1981).  They are at once "a voluntary settlement agreement which could be fully effective without judicial intervention" and "a final judicial order . . . placing the power and prestige of the court behind the compromise struck by the parties." *Williams*, 720 F.2d at 920.  Consent decrees "should be strictly construed to preserve the bargained for position of the parties." *Id*.  Courts have an affirmative duty to protect the integrity of its decree and ensure that the terms are effectuated.  *See Stotts v. Memphis Fire Dep't*, 679 F.2d 541, 557 (6th Cir. 1982), *rev'd on other grounds sub nom. Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561 (1984).

The underlying facts in this case bespeak both a long, storied history of racial discrimination against Blacks and Hispanics in the City of Cleveland and a persistent manifestation of the parties' intention to work collaboratively to remedy that discrimination as a means of saving time, expense, and the risk of further litigation. The parties' sustained negotiations yielded the Second Amended Consent Decree, which the district court, having signed the decree into effect, had an obligation to strictly construe to preserve the bargained-for position of the parties.

The court below was tasked with construing the terms of the Second Amended Consent Decree to determine whether the extension of time requested by both the plaintiffs and defendants was warranted. Instead, the district court terminated the Second Amended Consent Decree after finding that a 26% minority firefighter population, a shortcoming of the express goal of 33 1/3%, evidenced "substantial compliance" under the consent decree such that judicial monitoring was no longer necessary.

The district court's termination decision was based substantially, if not exclusively, on its conclusion that it was called for, perhaps even mandated, by the Supreme Court's decision in *Ricci v. DeStefano*, 129 S. Ct. 2658 (2009). This Court should disagree because this interpretation and application of *Ricci* is based on the unwarranted assumption that there exists a hypothetical person or class of persons in the Northern District of Ohio who could establish by relevant and admissible evidence the factual basis that would be necessary for that person or class of persons to become entitled to the relief obtained by the *Ricci* plaintiffs.

In its termination decision the district court did not identify any such person or class of persons as a party to the case which is now before the Court.

If such a person or class of persons does indeed exist, that person or class of persons is, of course, free to file a complaint seeking that relief. This Court, however, should not become an advocate for, or adjudicate, a hypothetical cause of action that might be filed by such a hypothetical person or class of persons. Nor should this Court

affirm the unwarranted assumption of the district court that such a person or class of persons in fact does exist which would be necessary before this Court could affirm the district court's termination decision.

I depart from the majority because I believe that the factual record is sufficiently developed for this Court to address the issue actually presented: whether the district court abused its discretion in denying the City of Cleveland's motion to extend the Second Amended Consent Decree. Because I find that the district court did abuse its discretion, I would reverse the district court and remand with instructions to enter the extension of five and a half years that was proposed and agreed upon by all parties. I further decline to vacate and remand to the district court for the purpose of embarking on a strict scrutiny excavation when: the constitutionality of the consent decree has already been litigated and resolved in the form of a Second Amended Consent Decree, neither the parties nor the district court challenged the constitutionality of the consent decree, and there has been no intervening change in facts or law that would require the court below to revisit the constitutionality of the consent decree.

I.

A.

In 1973, Lamont C. Headen, along with several other aspiring African-American firefighters who passed the requisite Civil Service Examination, filed a class action suit against the City of Cleveland ("City") on behalf of African-American and Hispanic applicants who were not offered employment as firefighters in the Cleveland Fire Department. The plaintiffs alleged that Cleveland's hiring practices amounted to discrimination on the basis of race, color, and national origin in violation of the Thirteenth and Fourteenth Amendments to the U.S. Constitution; 42 U.S.C. §§ 1981, 1983; and O.R.C. § 4112.02. The plaintiffs requested equitable relief as well as monetary damages. The Complaint averred that although 40% of the Cleveland population was Black, only 4% of the Cleveland firefighters were Black. The plaintiffs further alleged that the defendants did not engage in any substantial efforts to recruit

Black or Hispanic firefighters.  The plaintiffs attributed the discrimination to a schema of standard hiring practices that functioned as exclusionary devices to Black and Hispanic applicants.  More precisely, the plaintiffs averred that:

(a)     Written tests used as a prerequisite for employment exclude a disproportionately high number of minority applicants for employment as compared to the White applicants and have not been professionally developed nor validated to establish any predictive or reasonably predictive validity evidence that the tests measure job performance;

(b)     The background investigation and oral interviews exclude a disproportionately high number of minority applicants for employment as compared with White applicants because:
   (i)     factors are used to deny employment to minority persons which are not related to job performance;
   (ii)    arbitrary discretion is vested in the Defendants to decide whether or not to employ an applicant; this arbitrary discretion has been used by the Defendants to deny employment to a high proportion of minority applicants as compared with White applicants.
(c)     The psychological examinations are conducted by means of a written examination which discriminates against minority applicants and which fails to take into account the differing cultural experiences of minority applicants as compared to White, largely middle-class applicants.  Individuals are eliminated for "psychological" reasons which are not job related.
(d)     The medical examination excludes a disproportionately high number of minority applicants for reasons not related to the medical and physical requirements of the job of fireman.

On April 25, 1975, after an evidentiary hearing on these issues, the district court made a finding that the City had unlawfully discriminated against African-Americans and Hispanics in the hiring of firefighters—namely through the administration of an examination that was previously discredited as violative of the Fourteenth Amendment.[1] The presiding district court judge, Judge Robert B. Krupansky, found:

---

[1] In *Shield Club v. City of Cleveland*, 370 F. Supp. 251 (N.D. Ohio 1972), Judge William Thomas found that the entrance examination for patrolman conducted by the Cleveland Civil Service Commission had a racially discriminatory impact on Blacks and Hispanics and the City of Cleveland could not demonstrate that the exam was job-related. 370 F. Supp. at 254.

IT APPEARING to the Court that the entrance examination heretofore administered by the Defendants to candidates for the position of firefighter with the City of Cleveland Fire Department was an examination identical to the examination heretofore administered to candidates for the position of patrolman and patrolwoman; and it further appearing that this identical patrolman's examination was judicially determined to be in violation of the [E]qual [P]rotection [C]lause of the Fourteenth Amendment to the United States Constitution by the Honorable William K. Thomas in the case of *Shield Club v. City of Cleveland, et al.*, Civil Action No. C72-1088, United States District Court for the Northern District of Ohio, Eastern Division;

IT FURTHER APPEARING that the within action was filed on April 3, 1973 and that the Defendant Civil Service Commission has failed since April 6, 1973 to exercise diligent efforts to develop a new job-related entrance examination for the position of firefighter; and

IT FURTHER APPEARING that the remaining issues concerning the selection of firefighters for the City of Cleveland Fire Department are intimately interwoven as a practical matter with the administration of the entrance examination; and that said related issues bear a similar likeness to the issues fully litigated and determined by the Honorable William K. Thomas in the aforementioned case of *Shield Club v. City of Cleveland* . . . .

Judge Krupansky enjoined the City from hiring new firefighters until, *inter alia*, the court approved both a proposed entrance examination that was demonstrably job-related and revised screening procedures that were objective, job-related, and non-discriminatory. As a result of Judge Krupansky's findings and Order issued on April 25, 1975, the City submitted a proposed plan which reformed the City's hiring practices for firefighters on January 14, 1977. The plan primarily consisted of proposals to boost recruitment of minority applicants, restructure the entrance examination to be job-related, and revise the screening procedures to be more transparent and objective. Important to this appeal, the plan also proposed a formula devised to remedy past discrimination which provided that the ratio of minorities to non-minorities hired may not be less than the ratio of minorities to non-minorities who passed any given entrance examination (hereinafter the "*Headen* ratios"). Remarkably, all parties entered into a consent decree agreeing that the City's proposed plan "fully complies" with the terms

of the district court's order.  On January 17, 1977, this consent decree was ordered into effect by then-recently-assigned Judge John M. Manos.

The consent decree was amended on May 21, 1984, after the Vanguards of Cleveland ("Vanguards"),[2] an organization of Black and Hispanic firefighters employed by the City, were made parties to the *Headen* litigation. The amended consent decree, approved and adopted by Judge Manos, redefined the remedial provisions of the 1977 consent decree.  Throughout the life of the consent decree, the minority firefighter population steadily increased, reaching a zenith of 26th by 2000.

B.

The issues in the instant appeal stem from the following events in 2000 when the consent decree was amended for a second time.

On January 26, 2000, the City filed a Motion to Stay Further Execution of the Amended Consent Decree.  Shortly thereafter, on February 1, 2000, the Cleveland Firefighters for Fair Hiring Practices ("CFFHP") filed a lawsuit against the City of Cleveland which was consolidated with the *Headen* litigation.  The CFFHP alleged that the 1977 and 1984 consent decrees unconstitutionally discriminated against White applicants to the fire department.  The Vanguards defended the consent decree's constitutionality, while in turn claiming that the City had continued to engage in discriminatory hiring practices against minorities.  The City all the while denied engaging in any such discriminatory practices.  The district court held a hearing on

---

[2]On October 23, 1980, the Vanguards filed a class action on behalf of Black and Hispanic firefighters already employed by the City, primarily alleging that the City unlawfully discriminated on the basis of race and national origin in awarding promotions within the fire department in violation of the Thirteenth and Fourteenth Amendments to the United States Constitution, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and 42 U.S.C. §§ 1981, 1983.  Local 93 of the International Association of Firefighters ("Local 93"), a local union representing a majority of Cleveland's firefighters, was allowed to intervene pursuant to Fed. R. Civ. P. 24(a)(2).  The City, having unsuccessfully contested the basic factual issues in other lawsuits, entered into a consent decree with the Vanguards over the objection of Local 93.  The consent decree aimed to remedy the disproportionate rate of promotions between Blacks and Hispanics and their White colleagues.  Local 93 challenged the consent decree claiming that the consent decree was an unreasonable penalty on innocent non-minority firefighters. *See Vanguards of Cleveland v. City of Cleveland*, 753 F.2d 479, 484 (6th Cir. 1985).  This Court rejected Local 93's argument and upheld the consent decree. *Id*.  The Supreme Court also upheld the consent decree in *Local Number 93, International Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501 (1986).

February 2, 2000 to contend with the antithetical positions held by all the parties. After

the hearing, the court denied the City's motion and encouraged the parties to engage in

informal discovery and good faith negotiations. These negotiations produced a Second

Amended Consent Decree, which was signed into effect by the district court on

September 29, 2000.

The Second Amended Consent Decree ("2000 Consent Decree"), signed by all

parties, begins with the acknowledgment that the district court found "that the City of

Cleveland had unlawfully discriminated against minorities in the hiring of firefighters."

The 2000 Consent Decree expressed the following findings: 38.1% of the individuals

who met the qualifications to sit for the then-most-recent firefighter examination were

minorities; as of 2000, only 26% of the City's firefighters were minorities; and after

informal discovery, the City and the Vanguards both "believe[d] that the Second

Amended Consent Decree [was] necessary to fully remedy the effects of the City's past

discrimination in hiring of firefighters, and to prevent any further discrimination in the

future." Although CFFHP disputed whether the 2000 Consent Decree was necessary to

fully remedy past discrimination, it nonetheless agreed that "consistent with the Supreme

Court's directives in a series of cases including but not limited to *City of Richmond v.*

*J.A. Croson*, 488 U.S. 469, 109 S.Ct. 706 (1989) and *Adarand Constructors, Inc. v.*

*Pena*, 515 U.S. 200, 115 S. Ct. 2097 (1995), as well as the Sixth Circuit's guidance in

*Aiken v. City of Memphis*, 37 F.3d 1155 (6th Cir. 1994)," it desired to "resolve these

actions and to preclude any further extension and/or modification of the consent decree

*except as provided* [within the consent decree]." (emphasis added). The CFFHP, along

with the rest of the parties, further consented to entry of the Second Amended Consent

Decree, which in pertinent part provided:

> 1. The *Headen* decree shall remain in full force and effect until the City
> of Cleveland Department of Public Safety, Division of Fire, reaches a 33
> 1/3 % minority makeup or until the City has established and hired cadets
> from three eligible lists, (which shall include the current list originally
> certified in 1999 and herein referred to as the "1999 Eligible List"),
> whichever occurs first. Pursuant to Civil Service Rules, eligible lists are
> valid for two years. However, recognizing the lifespan of three lists and

the possible need for some additional administrative time, the City will have three lists (including the 1999 Eligible List which expires on September 29, 2002) established and appointments made therefrom before September 29, 2008. The parties understand that there may be legitimate circumstances which may prevent the City from establishing and hiring from the two additional eligible lists anticipated herein within the prescribed time. If the City is unable to establish three lists (including the 1999 Eligible List) and hire therefrom before September 29, 2008, the City may petition the Court for a reasonable extension of time within which to establish the remaining eligible lists and make appointments therefrom during the life of said lists. Such a petition by the City shall be approved for a reasonable time, provided that the City has made a good faith effort to meet the September 29, 2008 deadline. The percentage makeup of the Division of Fire shall be computed by determining the percentage of minorities (as defined by the decree) within the uniformed ranks of the Division of Fire, regardless of rank.

In the years following the 2000 Consent Decree, there were two main intervening occurrences that have impeded its full implementation. First, the City experienced a hiring freeze resulting from a confluence of factors including a budget crisis and the implementation of the statewide "DROP" program. The Ohio Police & Fire Pension Fund established the DROP program in 2003 to function as an incentive for eligible firefighters to postpone retirement. The 211 Cleveland firefighters who participated in the DROP program effected a hiring freeze when those would-be vacant positions were no longer available to potential hirees on the eligible list. The second occurrence was when Judge Manos, who had presided over the *Headen* litigation and this consent decree for 22 years, passed away and Judge Donald Nugent was assigned to this case in 2008.

On September 26, 2008, upon what the parties seem to agree was the natural termination of the consent decree, the City of Cleveland filed a Motion for Extension of Time to Comply with the *Headen* Decree, pursuant to the terms of the consent decree. The City claimed that "due to circumstances beyond [its] control it [had] not reached the 33 1/3% minority make-up nor been able to establish the second and third eligibility lists." The City cited a variety of occurrences beyond its control that hampered the City's compliance with the 2000 Consent Decree, including a budget crisis and the

DROP program. The Vanguards subsequently filed a Motion to Extend the Terms of the Second Amended Consent Decree on September 29, 2008. On October 24, 2008, the CFFHP filed a response opposing the extension requested by the City and the Vanguards. The district court held an evidentiary hearing on May 29, 2009, ostensibly to determine whether the City met the two prerequisites for an extension: (1) a good faith effort by the City to meet the September 29, 2008 deadline and (2) legitimate circumstances preventing the City from establishing two additional eligibility lists. However, after the parties presented evidence on these issues, the district court dispensed with closing arguments and asked the parties to brief why a third amended consent decree was necessary.

After the hearing on May 29, 2009, the parties "engaged in extensive discussion seeking a compromise to avoid further contentious and expensive litigation, restore harmony among the members of the Cleveland Fire Department, obtain additional manpower/womanpower within the firehouses as soon as reasonably possible, and ensure the safety of the residents of the City of Cleveland." During those discussions, the parties "negotiated what they unanimously agree[d] [was] a reasonable, necessary, practical, and fair response to the [petition for an extension of time] by the City." The parties consented to a  proposed a modification of the consent decree which would read as follows:

> The *Headen* decree shall remain in full force and effect until the City of Cleveland Department of Public Safety, Division of Fire, reaches a 33 1/3% minority makeup or until December 31, 2014, whichever comes first. Pursuant to Civil Service Rules, eligible lists are valid for two years. Pursuant to this Stipulation and Order, the City is required to have no less than one new eligible list established and appointments to any existing Department vacancies made therefrom before December 31, 2014. For these purposes, the percentage makeup of the Division of Fire shall be computed by determining the percentage of minorities (as defined by the decree) within the uniformed ranks of the Division of Fire, regardless of rank.

Despite each party's clear intent to support an extension of the 2000 Consent Decree for *at most* five and a half more years, and notwithstanding the provision in the

2000 Consent Degree that contemplated an extension of time for this very factual scenario, Judge Nugent ultimately denied the City's and Vanguards' motion for an extension of time, thereby terminating the 2000 Consent Decree in an order dated August 29, 2009.

> In its Order, the district court expressed the following findings:

> The history of this case makes clear that past injustices indeed existed in the City of Cleveland with respect to the hiring of minority firefighters. However, the [district court] has found that the City has made a good faith effort to comply with the remedy designed to right those wrongs. The evidence demonstrates that it was not the City's lack of effort, but rather circumstances beyond its control, that resulted in it falling short of satisfying the goals in the [2000 Consent Decree]. Based upon the evidence relating to the pending Motions, the Court finds that judicial monitoring is no longer a necessity.

The court further reasoned that the City's "good faith effort to comply" with the 2000 Consent Decree demonstrates that the City has a "foundation that will lead to increased minority representation once the economy allows for a more routine hiring process to resume."

The *Headen* plaintiffs, Vanguards, and City of Cleveland[3] now appeal the district court's denial of their respective motions for an extension of time to comply with the 2000 Consent Decree. Interestingly, notwithstanding the fact that the CFFHP agreed to the terms of the original 2000 Consent Decree and an extension of the 2000 Consent Decree, on appeal the CFFHP now argues that an extension of the 2000 Consent Decree is unconstitutional under the Supreme Court's decision in *Ricci v. DeStefano*, 129 S. Ct. 2658 (2009).

---

[3]Although the City of Cleveland is formally an appellee, it effectively raises an appellant's argument that the district court erred in denying its motion for an extension of time to comply with the 2000 Consent Decree.

II.

I dissent because I believe the district court clearly abused its discretion when it denied a motion by both plaintiffs and defendants for an extension of time given the occurrence of a factual scenario that the 2000 Consent Decree both contemplated and prescribed a remedy for—the very remedy that the parties requested. This abuse of discretion was aggravated when all parties had come to the table, negotiated, and agreed to a proposed final extension of at most five and a half years, only for the district court to dismiss their proposed modification and terminate the decree premature of reaching the agreed-upon remedial goal of either a 33 1/3% minority population or the hiring of firefighters from two additional eligibility lists. Not only do I take issue with the obstructionist and incongruent action of the district court, I further disagree with the majority that the issue presented to our Court is one that necessitates a strict scrutiny analysis absent a direct challenge before the district court regarding the constitutionality of the extension. Moreover, even if such an inquiry were necessary, I find the considerations proffered by the majority to be misguided. I would reverse the district court and remand with instructions to enter the stipulated agreement of the parties which would extend the decree for five and a half years, at most.

A.

This is a unique case. This is not a case involving a voluntary race-conscious remedy initiated by a state actor and challenged on constitutional grounds by another party; nor a case where the interpretation of a consent decree's terms is bitterly contested by the parties; nor is it a case where one party is unilaterally seeking a modification. Rather, this is a case involving a consent decree in which all parties agreed to the existence of the underlying past discrimination and the appropriateness of the prescribed remedy.

As the Supreme Court observed in *United States v. Armour & Co.*, 402 U.S. 673 (1971):

> Consent decrees are entered into by parties to a case after careful negotiation has produced an agreement on their precise terms. The parties waive their right to litigate the issues involved in the case and thus save themselves the time, expense, and inevitable risk of litigation. Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation. Thus, the decree itself cannot be said to have a purpose; rather the parties have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes of one of the parties to it. For these reasons, the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purpose of one of the parties to it.

402 U.S. at 681-82. In the instant case, the consent decree was a product of careful negotiation that resulted from, rather than in lieu of, a judicial finding of discrimination.

A plain reading of the terms of the 2000 Consent Decree makes it difficult to reconcile the district court's anomalous decision. The decree clearly states that the decree "shall remain in full force and effect until the City of Cleveland Department of Public Safety, Division of Fire, reaches a 33 1/3% minority makeup or until the City has established and hired cadets from three eligible lists . . . whichever occurs first." It is indisputable that the Fire Department neither reached a 33 1/3% minority makeup nor established and hired cadets from three eligible lists. Nevertheless, the consent decree prudently provides a safety-valve by acknowledging that "the parties understand that there may be legitimate circumstances which may prevent the City from establishing and hiring from the two additional eligible lists anticipated herein within the prescribed time." The decree then continues to state that "[i]f the City is unable to establish three lists and hire therefrom before September 29, 2008, the City may petition the Court for a reasonable extension of time with which to establish the remaining eligible lists and make appointments therefrom during the life of said lists." And, "[s]uch a petition *shall be approved* for a reasonable time, provided that the City has made a good faith effort to meet the September 29, 2008 deadline." (emphasis added). The text outlines "legitimate circumstances which may prevent the City from establishing and hiring two additional eligible lists within the prescribed time" and "a good faith effort to meet the

September 29, 2008 deadline" as the two dispositive factors in determining whether the City's petition "shall be approved."

The district court expressly found the occurrence of the requisite legitimate circumstances and a good faith effort on behalf of the City to meet the September 29, 2008 deadline. Upon making these findings, the district court's only inquiry should have been what would constitute a reasonable time by which to extend the decree. Instead, the district court completely disavowed the language of the decree and decided that judicial oversight was no longer necessary. Upon reviewing the facts in the record, I struggle to find a legitimate justification for the district court's departure from the terms of the consent decree that it signed into effect.

The majority hesitates to strictly enforce the terms of the decree in fear that doing so would essentially render the district court's role in administering a consent decree to be ministerial—a mere instrument of the consent decree or the parties' stipulations to it. But this characterization undervalues the district court's agency in facilitating, forming, and deciding to sign the consent decree into effect in the first place. It is not readily apparent how the district court's role is reduced to an instrument of the parties' stipulations by merely enforcing the terms of the consent decree that the district court signed into effect. Moreover, I find the inverse scenario, in which judges completely disregard the plain text of a consent decree, to be more offensive to the role of a court supervising a judicial order.

As I see it, the district court's role supervising this consent decree was not ministerial, but deeply involved. The district court found that the City of Cleveland unlawfully discriminated against Blacks and Hispanics in the hiring of firefighters. The same district court had the original discretion to give legal force to this consent decree. The court, via Judge Manos, decided in its discretion to place the imprimatur of the court on the 2000 Consent Decree. The district court further had discretion in determining whether the City's noncompliance with the consent decree resulted from "legitimate circumstances." The court, in its discretion, found that it did. Finally, the district court

had the discretion to determine whether or not the City acted in good faith.  Again, the court found that it did.  Given those findings, the court had an affirmative duty to protect the integrity of its decree and approve the City's motion for a reasonable extension of time unless the court's interest in implementing the plain language of the decree was superceded by an interest in either modifying or terminating the consent decree. The record shows no superceding interest in modifying or terminating the decree.

Of course, the majority is correct that the district court has discretion to terminate the decree, but the discretion to terminate a consent decree is limited to situations where the consent decree has met its underlying goal.  *See Youngblood v. Dalzell*, 925 F.2d 954, 960 (6th Cir. 1991); *Board of Educ. of Okla. City Public Schools v. Dowell*, 498 U.S. 237 (1991) (holding that the district court must consider whether the vestiges of past discrimination had been eliminated to the extent practicable before dissolving a desegregation decree).  We have held that "[a] district court must look to the specific terms of a consent decree in determining  whether and when to terminate supervision or jurisdiction over it." *Gonzales v. Galvin*, 151 F.3d 526, 531 (6th Cir. 1998).  The district court must further "determine that the goals of the consent decree have been achieved." *Youngblood*, 925 F.2d at 961.  In *Gonzales*, this Court outlined the following six factors that the district court should consider in deciding whether to terminate a consent decree: (1) whether any specific terms provide for continued supervision; (2) the underlying goals of the consent decree; (3) whether there has been compliance with prior court orders; (4) defendants good faith effort to comply; (5) the length of time the consent decree has been in effect; and (6) the continuing efficacy of the consent decree's enforcement. *Gonzales*, 151 F.3d at 531.  Although the district court should consider these factors, we made it clear that "[n]otwithstanding this list of 'factors,' a district court may not terminate its jurisdiction until it finds both that Defendants are in compliance with the decree's terms and that the decree's objectives have been achieved." *Id.*

In the instant case, the district court clearly did not lend much weight, if any, to the express terms of the 2000 Consent Decree relating to its obligation to approve an

extension. The court similarly gave scant attention to the fact that the underlying goals of the 2000 Consent decree were not met. The City had neither achieved a 33 1/3 % minority firefighter workforce nor created the two eligible lists that it was obligated to create. Nonetheless, the district court somehow found that the City of Cleveland had "substantially complied" with the goal of the consent decree because the minority makeup of the Fire Department had reached 26%. There is no indication why 26% suffices as substantial compliance, especially in light of the fact that the fire department had a 26% minority makeup in 2000 when Judge Manos and all parties found it necessary to approve the 2000 Consent Decree. Moreover, in the seven years between 2001 and 2008, when the City severely restricted its hiring, the minority population stayed stagnant. Yet in 2009, after 9 years of virtually no progress toward the agreed-upon goals of a 33 1/3 % minority makeup or two additional eligible lists, Judge Nugent found that "the City's efforts have resulted in substantial compliance with the stated goal of 33 1/3% minority makeup." The district court cannot square this finding with the fact that the City was in a state of noncompliance with the 2000 Consent Decree for eight years. The district court improperly applied the law from our consent decree cases by placing too much weight on the length of the remedy while disregarding both the mandated extension and the stated goals of the consent decree. In my view, this was a clear abuse of discretion.

Interestingly, the district court draws parallels to our unpublished decision in *Rutherford v. City of Cleveland*, 179 F. App'x 366 (6th Cir. 2006), to support its termination of the 2000 Consent Decree. The court's reliance on *Rutherford* is puzzling. There, we upheld the constitutionality of a consent decree between minority police officers and the City of Cleveland after non-minority police officers challenged the decree's constitutionality. The consent decree in *Rutherford* had a similar background as the consent decree in the *Headen* litigation in that it resulted from a judicial finding of racial discrimination in the hiring practices of the City of Cleveland—primarily based on the use of a discriminatory entrance examination. The terms of the *Rutherford* consent decree similarly set a remedial goal of a 33% minority workforce by a defined

date through the use of a hiring ratio. The terms of the consent decree in *Rutherford* also allowed for an extension in the event of certain occurrences. In *Rutherford*, however, the district court terminated the consent decree only after the Cleveland Police Department had actually met the goal of a 33% minority police force using a hiring ratio of three minorities to every four non-minorities. The district court in *Rutherford* enforced the extension provision in the consent decree until the express goal of the decree was met. In the instant case, the district court failed to enforce the extension provision in the 2000 Consent Decree and terminated the consent decree premature of the express goals being met. Moreover, when the appellants in *Rutherford* argued that the 29.6% minority population "substantially met" their target of 33% such that an extension of the consent decree was unjustified, we held that even with a 29.6% minority population, the consent decree was justifiably extended by its own terms until the express goal of a 33% minority workforce was met. *See Rutherford*, 179 F. App'x at 380. Thus, *Rutherford* further suggests that the district court's termination of the 2000 Consent Decree was an abuse of discretion.

B.

Although the issue presented to our Court was whether the district court abused its discretion in denying the City's motion to extend the 2000 Consent Decree, the majority vacates the district court's order and remands for the district court to resolve the issue of "whether, 31 years out, the decree's racial classifications continue to remedy past discrimination . . . " I disagree that the district court needs to re-litigate the constitutionality of the consent decree in this case for two principal reasons. First, not a single party has challenged the constitutionality of the 2000 Consent Decree. The majority concedes that the district court "did not style its decision as constitutional," yet the majority proceeds to raise hypothetical constitutional concerns because the district court's analysis purportedly "went to a question constitutional in origin: whether the court could lawfully extend the decree's race-based measures to apply more than 37 years after they were first adopted." The majority essentially substantiates the district court's erroneous analysis by reformulating an issue before us on appeal (whether the

district court abused its discretion in denying an extension) into an issue that is not before us (whether the 2000 Consent Decree's provision meets strict scrutiny). Generally, a reviewing court should not consider issues in the first instance when they were not litigated in the trial court except in exceptional circumstances. *Taft Broadcasting Co. v. United States*, 929 F.2d 240, 243-44 (6th Cir. 1991). Although it is the affirmative duty and province of the courts to apply the long-settled limitations of the Constitution, it is neither our duty nor province to create and imagine hypothetical and conceivable constitutional issues that are not properly presented before the court.

The legal basis for extending the 2000 Consent Decree for a reasonable time primarily lies within the terms of the consent decree itself. To the extent that the majority is suggesting constitutional infirmities with an extension for a reasonable amount of time, it is suggesting constitutional infirmities with the 2000 Consent Decree itself. The problem is that no party raised any constitutional objection to the 2000 Consent Decree before the district court. To be sure, the 2000 Consent Decree is a manifestation of a constitutional challenge to the preceding consent decree, so the constitutionality was very much on the minds of the parties and the district court when it approved the 2000 Consent Decree. The decree explicitly states that the parties wished to resolve the litigation "consistent with the Supreme Court's directives in a series of cases including but not limited to *City of Richmond v. J.A. Croson*, . . . *Adarand Constructors, Inc. v. Pena*, . . . as well as the Sixth Circuit's guidance in *Aiken v. City of Memphis*." (citations omitted). It was upon this understanding of constitutional guidance that the parties fashioned the remedy outlined in the consent decree and upon which the district court placed the imprimatur of the court. The district court was correct to consider the constitutionality of the remedy set forth in the consent decree in 2000 because, as the majority points out, consent decrees are subject to strict scrutiny as with any racial classification imposed by the government. However, the district court considered the constitutionality and concluded that the consent decree met the strict scrutiny requirements as expounded in the relevant Supreme Court and Sixth Circuit cases. That finding was certainly not challenged in 2000 when all parties signed the

consent decree; nor was it challenged in 2009 when all parties agreed to extend the consent decree.

Second, the relevant case law has not changed such that a reevaluation of the consent decree's constitutional compliance is necessary. On appeal, CFFHP argues that the Supreme Court's decision in *Ricci v. DeStefano*, 129 S. Ct. 2658 (2009) essentially required the district court to terminate the consent decree. The district court also relied on the holding in *Ricci* to support its termination of the consent decree. The appellees' and district court's reliance on *Ricci* is misplaced. In *Ricci*, the Supreme Court considered the question of whether the City of New Haven violated Title VII of the Civil Rights Act of 1964 when its Civil Service Board decided not to certify a newly implemented promotion examination for firefighters after the results indicated the test had a disproportionate adverse effect on minorities. The Court concluded that in order for the City's actions to be justified under Title VII, it would have to point to a strong basis in evidence that the City would be liable under Title VII if it had not taken action. Because the Supreme Court found that the Civil Service Board could not make such a showing given the evidence surrounding the examination's validity, the Court held that the Civil Service Board's decision itself violated Title VII. The Court expressly declined to reach the question of whether the City's action violated the Equal Protection Clause. *Ricci*, 129 S. Ct. at 2664-65. An employer-initiated, voluntary race-conscious remedy crafted to preempt a Title VII disparate impact suit—like the one at issue in *Ricci*—is markedly different than a consent decree founded upon the assent of all parties to remedy a judicial finding that a City's hiring practices violated the Equal Protection Clause, like the decree at issue here. In short, the decision in *Ricci* does not extend as far as to warrant a constitutional reassessment in this case—especially when doing so would subvert the clear intent of all parties to "avoid further contentious and expensive litigation" by requiring them to re-litigate the narrowly-tailored and/or compelling interest prongs of strict scrutiny. Even if *Ricci* clarified the law in some way meaningful to the consent decree here, a clarification in the law does not automatically open the door for relitigation of the merits of every affected consent decree because to hold such would

"undermine the finality of such agreements and could serve as a disincentive to negotiation of settlements in institutional reform litigation." *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 389 (1992).

Sadly, it is clear that the most salient aspect of this case to the majority and the district court is the longevity of the remedy, not whether justice has been fulfilled. The majority seems to favor expedience over effectiveness. According to the majority, "[t]he question[] whether the decree's goals have been met" is ultimately subordinate to "the core issue" of whether 31 years may render the 2000 Consent Decree less remedial. The ultimate lesson from our nation's struggle for racial equality is that justice is not always swift and convenient, but it is enduring. When pernicious forms of discrimination have infected the foundation of an institution, the remedy necessarily will take time to fulfill. The passage of time without more does not signify the ineffectiveness of a remedy. Rather, it is the inability of the remedy to produce just outcomes over time that signifies its ineffectiveness.

It is unclear how, short of achieving the goals set forth in a consent decree, the passage of 31 years makes the racial classification less remedial. It is equally bewildering how remedying past discrimination within an institution becomes less compelling because another year has passed. The majority does not answer how remedying past discrimination in the Cleveland Fire Department can be compelling in 1977, yet while the effects of past discrimination still linger—as they clearly do here given that the Cleveland Fire Department has not reached the agreed-upon goal of a 33 1/3% minority demographic—it may not be compelling in 2009. What is significant about 13 years (or 31 years) such that the majority is willing to make it the benchmark, *a priori*, for when the "remedial purpose of affirmative action [is] satisfied?" (internal citations and quotation marks omitted). The arbitrariness attendant with this time-oriented approach to narrow-tailoring, rather than a results-oriented approach, would undermine any good-faith attempt to fashion a serious remedy to longstanding discrimination—especially in the context of institutional reform litigation. Such a narrow approach would provide a safe haven for the most virulent forms of

discrimination, whose effects will outlast an arbitrary number of years affixed to a remedy.

Our decision in *Rutherford* speaks persuasively on the duration of race-conscious relief as it relates to consent decrees. The Cleveland Police Department had a similar past of racial discrimination in hiring, and yet a more aggressive hiring ratio. When the non-minority police officers argued that the remedial measures extended too far in time, we acknowledged that although narrow-tailoring will not allow race-conscious relief to extend in perpetuity, remedial action takes time, precisely because discrimination may linger for many years in an organization. *See Rutherford*, 179 F. App'x at 380.

In the instant case, although the consent decree had been in operation for 31 years when it was terminated, it was only functional for 24 years because the City stopped hiring qualified candidates in 2001 due to its budgetary constraints. The City further stopped creating eligible lists to allow for more qualified minority candidates to be considered. The remedy set forth in the 2000 Consent Decree was neither arbitrary nor perpetual. The *Headen* ratio prescribed a hiring ratio commensurate with the percentage of minority candidates who passed the entrance examination. The decree had a concrete expiration date of September 29, 2008, and a provision which would allow it to be extended for only a reasonable amount of time. In 2009, the parties agreed to extend the decree a final time and implemented a firm sunset date of December 31, 2014. During the years that the consent decree was functional, the percentage of minority firefighters increased from 4% to 26%. During the years the consent decree was not functional, the percentage remained stagnant, failing to reach the goal of 33 1/3%. As such, I cannot agree with the majority's reasoning that the consent decree's 31 years of operation may render its goal of remedying past discrimination less compelling or its method less effective.

III.

I conclude by refocusing on the actual issue presented in this appeal, which is whether the district court abused its discretion in denying the City of Cleveland's motion for an extension. I emphasize that the district court did abuse its discretion. The arbitrary and cavalier nature of the district court's decision was further illustrated at oral argument where the appellants claimed that Judge Nugent, off the record, told the parties, "You either come back with [a proposal of a two-year extension] or I'm going to rule." The appellants claim that the district court did not indicate why his proposal of a two-year extension was suggested or even how it was reasonable. The judge left the parties in a position where they were force to choose between his way or the highway, and Judge Nugent's way prevailed. Throughout the history of this litigation, three federal district court judges decided that a consent decree was necessary to remedy the effects of a history of employing a discriminatory entrance examination. Judge William Thomas first found Cleveland Police Department's use of the entrance examination was unconstitutional and signed a consent decree into effect in the *Shield Club* litigation, *see Rutherford*, 179 F. App'x at 368-72; Judge Robert Krupansky then found the Cleveland Fire Department's use of the same entrance examination to be unconstitutional; and Judge John Manos found it necessary to sign the instant consent decree into effect in 1977, 1984, and 2000.

Judge Nugent's decision to terminate the consent decree was at odds with: (i) Judge Krupansky's finding that the Cleveland Fire Department engaged in discriminatory hiring practices; (ii) Judge Manos's finding in 2000 that a consent decree was still necessary to remedy past discrimination; (iii) the consent decree's express goals of either a 33 1/3% minority population or the establishment and hiring from two additional eligible lists, when the actual minority population was 26% and the City did not establish any additional eligible lists; (iv) the text of the decree stating that an extension shall be granted upon a finding of legitimate circumstances for noncompliance and a good faith effort; (v) the legitimate request for an extension of time by the City of Cleveland, which represents the interest of all its residents and employees; (vi) the

legitimate motion for an extension of time by the Vanguards, who represent the interest of minority firefighters and applicants; and (vii) CFFHP's consent to extend the decree until December 14, 2014 at the latest.  There was but one factor standing on the other side of justice: Judge Donald Nugent.  I vigorously dissent.